[No. 55879-0-I.  Division One.  August 28, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. PAUL TIMOTHY CHASE, *Appellant*.

*Elaine L. Winters* and *Susan F. Wilk* (of *Washington Appellate Project*), for appellant.

*David S. McEachran, Prosecuting Attorney,* and *Eric J. Richey* and *Hilary A. Thomas, Deputies*; and *Philip J. Buri* (of *Buri Funston, P.L.L.C.*), for respondent.

¶1 AGID, J. — A jury convicted Paul Chase of first degree theft for exerting unauthorized control over auto repair

equipment he leased and later tried to sell despite being well behind on his payments. He appeals on two grounds: (1) the State had to charge him under the theft of rental/ leased property statute because it is concurrent with the first degree theft statute and (2) the trial court erred by refusing to instruct the jury on the good faith claim of title defense. Neither argument is persuasive. The statutes are not concurrent because they determine the value of property differently. And Chase presented no objective evidence from which the jury could infer that he, in good faith, claimed title to the equipment. We affirm.

## FACTS

¶2 In October 1999, Paul Chase started an automobile repair business in Bellingham. He entered into a credit lease purchase contract with Snap-On Tools for various pieces of equipment, including a Sun 450 EL diagnostic unit, a "motor vac," a "smoke machine," and an MT 2500 scanner. The total cost of the equipment, including tax but excluding finance charges, was $29,834.89.[1] Under the contract, Chase was to make payments on the equipment for the period of the loan and then could purchase the equipment outright for an extra dollar at the end of the loan. The contract prohibited Chase from selling the equipment until he paid off the loan in full. After several months, Chase's business was struggling and he eventually stopped making payments on the loan. The parties dispute exactly what happened over the next several years, but they lost contact sometime in 2001 with Chase still in possession of the equipment and owing $20,000 on the loan.[2]

¶3 On June 18, 2003, Todd Black, who owned another Bellingham auto repair shop, saw an eBay listing for a 450 EL and set up a meeting with the owner, who turned out to

---

[1] The 450 EL was the most expensive item on the contract.

[2] Chase claims he tried several times to have Snap-On pick up the equipment but it was unresponsive. Snap-On representatives claim they tried to collect the debt and eventually get the equipment back from Chase but at some point they simply could not find him anymore.

be Chase. Black was concerned this may be the same machine Snap-On leased to Chase, so he alerted Marc Fox, the local Snap-On dealer who sold the equipment to Chase. Black set up another meeting with Chase a few days later so that, unbeknownst to Chase, Fox could see the machine. Fox and Snap-On Field Manager Brian Gjersee arrived at this second meeting and demanded the machine back. Chase told them it was not the same machine Snap-On leased to him, and Fox and Gjersee could not verify that it was in fact the same machine because the serial numbers and data plate were missing. Eventually Chase said they could take the equipment but only if they gave him a receipt. They did not give him a receipt and left without the machine. Fox reported the situation to the Whatcom County Sheriff's Office.

¶4 Deputy Paul Murphy eventually contacted Black and had him set up another meeting with Chase to look at the equipment. On August 7, 2003, Chase brought the 450 EL to Black's shop and Deputy Murphy showed up a short time later. After a brief discussion, Deputy Murphy told Chase he thought he could link the Windows operating system number from the 450 EL Chase was selling to the one Snap-On reported stolen.[3] He then arrested Chase. The next day, Chase told Deputy Murphy that the 450 EL was indeed the one from Snap-On and that he had acted on bad advice in trying to sell it. Chase gave Deputy Murphy a written statement to this effect. The State charged Chase with one count of theft in the first degree.[4]

¶5 At trial, Fox testified that when he and Gjersee demanded the 450 EL back in June 2003, Chase told him it was not the Snap-On machine but rather one that he had bought used from another company. Gjersee testified that Snap-On eventually wrote off Chase's account. He explained

---

[3] At some point Fox identified the 450 EL as the same one he sold to Chase based on the physical appearance of the machine along with information from the Windows operating system. He estimated the 450 EL's value at $6,000 based on its condition and age.

[4] It is unclear exactly what happened to the other Snap-On equipment on the lease, although Chase had posted other eBay ads with the same models.

that after a certain amount of time passed without payment, the account was put into bad debt status and Snap-On tried to recover the merchandise. He said that when he and Fox demanded the 450 EL back, Chase told them it was not the same equipment and that another loan agency had repossessed Snap-On's 450 EL as collateral. Black testified that Chase continuously tried to sell him the 450 EL in the weeks after Fox and Gjersee had demanded it back. Black said Chase told him there was nothing Snap-On could do, but he told Chase he wanted to wait until the issue was settled. He testified he eventually set up the August 7, 2003 meeting with Chase at Deputy Murphy's request.

¶6 Deputy Murphy testified that when he contacted Chase on August 7 at Black's shop, Chase initially told him that the 450 EL he was showing Black was not the same piece of equipment Snap-On reported stolen and that Snap-On's equipment had been repossessed by another loan company, "Downhome Washington." He said that after he told Chase he thought they could link the Windows operating system number from the 450 EL to the one Snap-On reported stolen, Chase told Murphy he forgot he had reloaded this machine with the software from the Snap-On machine. Murphy stated that when he talked to Chase the next day in jail, Chase admitted the 450 EL was the one from Snap-On and said he had acted on bad advice in trying to sell it. Deputy Murphy said Chase told him "it was his understanding that if, if a company had claimed a piece of equipment as a tax loss or written it off as bad debt that nothing criminally could happen from that point forward." The trial court denied Chase's motion to dismiss at the close of the State's case, finding prima facie evidence of theft.

¶7 Chase testified on his own behalf. He described his business troubles and said that he knew he was behind in his payments to Snap-On but that he tried to contact it several times to have it pick up the equipment. He said he tried to start another repair shop in 2001 but it was also unsuccessful. Later that year, he moved the Snap-On equip-

ment into storage.[5] He said that in May 2002 his small business lender, Downhome Washington, picked up some equipment, including all of his hand tools.[6] He said he attempted to contact Snap-On during this time, for about two to three weeks, because he knew he was still in debt to it as well.

¶8  Chase stated that in June 2003 he decided to post the remaining equipment on eBay to sell it and get out of the loan.[7] He said that when Fox and Gjersee demanded the 450 EL at his meeting with Black, he told them he "had no option but to release the equipment to them" but he wanted a receipt because he was due a credit on his loan if Snap-On repossessed the equipment and his obligation was to Snap-On Tools credit, not Fox and Gjersee. Chase said he did not hear anything from Snap-On after the Fox/Gjersee incident. He said he and Black remained in contact. Eventually, Black told him he wanted to buy the 450 EL, so they met again. That was when Deputy Murphy arrested Chase.

¶9  Chase said Downhome Washington wanted to take the 450 EL when it took other equipment from his storage unit in May 2002. He said there was a debate at that time about the serial numbers on the machine, and that was the last time he saw the serial numbers. He said he told Fox, Gjersee, and Deputy Murphy that the 450 EL was not the Snap-On machine because it did not have all the same parts as the original machine. He testified that an employee had accidentally damaged Snap-On's 450 EL so Chase bought another damaged 450 EL and transferred equipment from that machine to the Snap-On 450 EL until it worked again. He said he never intended to steal the equipment.

---

[5] Chase said he tried to start up yet another shop in late 2002 but it was again unsuccessful.

[6] It is unclear exactly what equipment Downhome Washington allegedly retrieved from the storage unit, but Chase said it did not take Snap-On's 450 EL or motor vac. Downhome Washington did give Chase a small business loan, but nobody from Downhome Washington testified at trial.

[7] Besides the 450 EL, it is unclear which of the items on the Snap-On lease Chase attempted to sell on eBay.

¶10 On cross-examination, Chase admitted he knew the lease contract prohibited him from selling the equipment until he paid it off and he knew he had not paid off the lease and had not made any payments since sometime in 2001. He said that he tried to sell the 450 EL on eBay and that he sold "a" motor vac on eBay and "possibly" attempted to sell a smoke machine on eBay as well because he "was probably trying to find somebody to buy it to get assets sold to pay Snap-On." Chase stated that it was "possible" that Snap-On's Ron Patton, who was in charge of Chase's loan, gave him a "final warning" in 2001 that Chase had to pay up or Snap-On wanted its equipment back.[8]

¶11 After Chase testified that he did not want to sell the 450 EL to Black if he was not allowed to, the prosecutor asked him if that was because Snap-On had an interest in that property, and the following dialogue ensued:

A: Yes, I mean, to me they, Snap-On had, I had checked my credit report, and I know what's known as an INI, which means debt written off, and I was trying to clear my debt with them.

Q: Is that because you were concerned about Snap-On and their interest in that property?

A: I was concerned about getting my credit report cleared.

Q: You weren't concerned about giving the property back to them though, were you?

A: If they wanted the property back, I would have given it back, if they would have given me a receipt.   .

Chase confirmed that he gave Deputy Murphy a statement the day after his arrest and that he told Deputy Murphy he kept the equipment because he was advised that there was nothing Snap-On could do to him if it had written off the property as a tax loss.

¶12 Before the start of the final trial day, the court denied Chase's request for a jury instruction on the good faith claim of title defense. At the close of evidence, Chase again unsuccessfully requested the instruction. The court

[8] Chase said it was possible he spoke with Patton as late as July 2001.

ruled that the State offered evidence that Chase "was attempting to by deception in terms of what he told folks, and this would be obviously for the jury to decide, but the evidence was that it was by color of deception that he tried to maintain these items, and I think that's sufficient to avoid the granting of that instruction based upon the cases." The jury convicted Chase, and he was sentenced within the standard range.

## DISCUSSION

### I. *Concurrent Statutes*

¶13 Chase argues that RCW 9A.56.030, the first degree theft statute, and RCW 9A.56.096(5)(a), the theft of rental/leased property statute, are concurrent and the State erred by charging him under the general theft statute rather than the special theft of rental/leased property statute. The State argues the statutes calculate the value of property differently, so a defendant could be guilty under one statute without being guilty under the other. This court reviews issues of statutory construction, including whether statutes are concurrent, de novo.[9]

> When a special statute is concurrent with a general statute, the accused must be charged solely under the special statute. In order for statutes to be concurrent, each violation of the special statute must result in a violation of the general statute. In order to determine whether two statutes are concurrent, we examine the elements of each statute to determine whether a person can violate the special statute without necessarily violating the general statute.[10]

Statutes are not concurrent unless the general statute is violated every time the special statute is violated.[11]

---

[9] *State v. Heffner*, 126 Wn. App. 803, 807, 110 P.3d 219 (2005) (citing *State v. Bradshaw*, 152 Wn.2d 528, 531, 98 P.3d 1190 (2004), *cert. denied*, 544 U.S. 922 (2005)).

[10] *Id.* at 808 (citations omitted).

[11] *State v. Shriner*, 101 Wn.2d 576, 580, 681 P.2d 237 (1984).

■ ¶14 First degree theft requires proof that the defendant wrongfully obtained or exerted unauthorized control over another's property valued at more than $1,500, with the intent to deprive that person of the property.[12] First degree theft is a class B felony.[13] "Value" under the general first degree theft statute "means the market value of the property or services at the time and in the approximate area of the criminal act."[14] Theft of "rental, leased, or lease-purchased property" requires proof that the defendant wrongfully obtained or exerted unauthorized control over property that was rented or leased to the defendant, with the intent to deprive the owner of such property.[15] Theft of rental or leased property valued at $1,500 or more is a class B felony.[16] "Value" under the special theft of leased property statute means the "replacement value" of the property.[17]

¶15 In *State v. Shriner*, the Washington Supreme Court held that former RCW 9A.56.095 (1977), the predecessor to the current theft of leased property statute, was concurrent with the first degree theft statute.[18] Former RCW 9A.56-.095 provided that "a person is guilty of criminal possession of leased or rented machinery, equipment or a motor vehicle if the value thereof exceeds one thousand five hundred dollars," but it did not separately define "value." When the legislature repealed RCW 9A.56.095 in 1997 and replaced it with RCW 9A.56.096, it specifically defined the value of leased stolen property as that property's replacement value. No court has addressed whether the current theft of leased property statute, RCW 9A.56.096, is also concurrent with the first degree theft statute.

---

[12] RCW 9A.56.030(1)(a), .020(1)(a).

[13] RCW 9A.56.030(2).

[14] RCW 9A.56.010(18)(a).

[15] RCW 9A.56.096(1).

[16] RCW 9A.56.096(5)(a).

[17] RCW 9A.56.096(4).

[18] 101 Wn.2d 576, 580, 681 P.2d 237 (1984).

¶16 Because the statutes use two different methods to value property, a defendant could violate the special statute without violating the general statute any time the property's market value is less than its replacement cost.[19] *Black's Law Dictionary* defines "fair market value" as the "price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect."[20] It defines "replacement cost" as the "cost of a substitute asset that is equivalent to an asset currently held. The new asset has the same utility but may or may not be identical to the one replaced."[21] For instance, suppose a machine's market value is $1,200 after two years of use, but it costs $1,600 to replace that machine with one that has the same utility.[22] A defendant who steals the machine would be guilty of first degree theft of rental property but would not be guilty of first degree theft based on the different valuations of property under each statute. The difference between "replacement value" and "market value" means a defendant can be guilty of first degree theft of leased property without being guilty of first degree theft.

¶17 Chase argues that under the facts of this case, it was impossible for him to violate the first degree theft of rental property statute without violating the first degree theft statute. That may be true, but the question is whether *all*

---

[19] *See United States v. 564.54 Acres of Land*, 441 U.S. 506, 508, 99 S. Ct. 1854, 60 L. Ed. 2d 435 (1979) (The just compensation clause of the Fifth Amendment required payment of only the fair market value rather than the replacement cost of the property taken.); *Thompson v. King Feed & Nutrition Serv., Inc.*, 153 Wn.2d 447, 459, 105 P.3d 378 (2005) (fair market value of a barn estimated to be $300,000 while the replacement cost of the barn was estimated at over $500,000); *State v. Smith*, 42 Wn. App. 399, 401, 711 P.2d 372 (1985) (Appellant argued an "insurance company could recover only the fair market value, not the replacement cost, of the items stolen and later recovered and sold by the insurer."), *review denied*, 105 Wn.2d 1010 (1986).

[20] BLACK'S LAW DICTIONARY 1587 (8th ed. 2004).

[21] *Id.* at 372.

[22] We note that the State incorrectly interprets "replacement cost" as the cost of replacing stolen property with *new* property. Nothing requires that the replacement property be new; it need only have the "same utility" as the property replaced. *See id.* at 372.

violations of the first degree theft of leased property statute are necessarily violations of the first degree theft statute. Because they are not, the statutes are not concurrent.

## II. *Good Faith Claim of Title Defense*

■ ¶18 Chase argues the trial court erred by refusing to instruct the jury on the good faith claim of title defense. We review the trial court's decision whether to give a particular jury instruction for abuse of discretion.[23] However, where evidence supports giving a good faith claim of title instruction, failure to give the instruction is reversible error.[24]

■ ¶19 Jury instructions are sufficient "when, taken as a whole, they properly inform the jury of the applicable law, are not misleading, and permit the defendant to argue his theory of the case."[25] "If any element of a defense is missing, the defense should not be presented to the jury in the instructions."[26] RCW 9A.56.020(2)(a) provides: "In any prosecution for theft, it shall be a sufficient defense that . . . [t]he property or service was appropriated openly and avowedly under a claim of title made in good faith, even though the claim be untenable."[27] A defendant is entitled to an instruction on this defense only if he or she presents evidence "(1) that the property was taken openly and avowedly and (2) that there was some legal or factual basis

[23] *Bulzomi v. Dep't of Labor & Indus.*, 72 Wn. App. 522, 526, 864 P.2d 996 (1994) (citing *Thomas v. Wilfac, Inc.*, 65 Wn. App. 255, 828 P.2d 597, *review denied*, 119 Wn.2d 1020 (1992)).

[24] *State v. Hicks*, 102 Wn.2d 182, 187, 683 P.2d 186 (1984). When we review the failure to give an instruction as a matter of law, our review is de novo. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995). In this case, the outcome is the same under either standard of review.

[25] *State v. Tili*, 139 Wn.2d 107, 126, 985 P.2d 365 (1999) (citing *State v. Theroff*, 95 Wn.2d 385, 389, 622 P.2d 1240 (1980)).

[26] *State v. Bell*, 60 Wn. App. 561, 566, 805 P.2d 815 (citing *State v. Griffith*, 91 Wn.2d 572, 575, 589 P.2d 799 (1979)), *review denied*, 116 Wn.2d 1030 (1991).

[27] "This defense negates the element of intent to steal by providing that a defendant cannot be guilty of theft if the defendant takes property from another 'under the good faith belief that he is the owner, or entitled to the possession, of the property.' " *State v. Ager*, 128 Wn.2d 85, 92, 904 P.2d 715 (1995) (quoting *Hicks*, 102 Wn.2d at 184).

upon which the defendant, in good faith, based a claim of title to the property taken."[28]

■ ¶20 In *State v. Ager*, insurance company owners were convicted of embezzlement and argued on appeal that they were entitled to the good faith claim of title defense instruction because the funds they took from the company were "advances" authorized by the Insurance Code, Title 48 RCW.[29] The trial court ruled that insufficient evidence supported giving the instruction because the defendants did not provide a factual basis for the good faith belief that they were entitled to the funds.[30] The Washington Supreme Court agreed, holding that although the statute recognized insurance companies could authorize advances, there was no evidence that the defendants' insurance company authorized such advances.[31] Thus, the evidence established "no legal or factual basis from which a jury could infer a good faith claim of title."[32] Evidence which might have allowed a jury to infer that defendants had a good faith belief they had a right to take and use the funds included "past practices of the company with respect to advances, acts showing that past advances of this nature were approved or acknowledged by the board of directors, or statements by the board of directors . . . that might have been interpreted by Defendants as authorizing them to take advances . . . from the insurance company."[33]

¶21 Chase did not present sufficient evidence to show that he exerted control over the property openly and avowedly after he stopped making payments.[34] The identification plate and serial numbers had been removed from the

---

[28] *Id.* at 95.

[29] 128 Wn.2d 85, 93, 904 P.2d 715 (1995).

[30] *Id.* at 91.

[31] *Id.* at 96.

[32] *Id.*

[33] *Id.* at 97.

[34] Snap-On does not dispute that Chase rightfully had control of the equipment while he was making payments on the loan.

450 EL. Black, Fox, Gjersee, and Deputy Murphy all testified that Chase told them the 450 EL was not the Snap-On machine. Gjersee and Deputy Murphy testified Chase told each of them separately that another loan company had repossessed Snap-On's 450 EL. Chase later admitted to Deputy Murphy at jail that the machine was in fact the Snap-On machine, and the software confirmed this. Chase testified that another lender had removed the serial numbers and he told people it was not the Snap-On machine only because it had parts from another machine in it. But there was no objective evidence to corroborate his account. Even if Chase's testimony created an issue of fact about whether he openly and avowedly took control of Snap-On's equipment, there is insufficient evidence to support an inference that he had some legal or factual basis upon which he, in good faith, based a claim of title to the equipment.

¶22 Only Chase's own trial testimony suggested he acted in good faith, and even his testimony does not demonstrate all the necessary elements of the defense. He contends he acted like someone who believed Snap-On had abandoned its property instead of someone who intended to deprive Snap-On of its property. But even after several months had passed with Chase in arrears and no contact between him and Snap-On, he still knew Snap-On had not abandoned its property because Fox and Gjersee demanded that he give the equipment back. His testimony that he would have given the equipment back if they had given him a receipt only confirms that he knew Snap-On was the rightful owner and he did not have a good faith claim to the title.

¶23 Even if the jury believed Chase tried to contact Snap-On to have it pick up its equipment, that is not a factual or legal basis upon which he, in good faith, could claim title. He testified that he relied on "bad advice" in believing that Snap-On could not do anything to him if he sold the equipment once it had written off the debt as a loss. But he never said who gave him the advice, and no one corroborated his account. Under *Ager*, there must be evi-

dence of good faith beyond a defendant's subjective beliefs. The *Ager* court cited examples of objective evidence that could have allowed a jury to infer that defendants had a good faith belief.[35] Absent at least some objective corroborative evidence, Chase's testimony is insufficient to allow a jury to infer that he had a good faith belief that he had a claim to the title.

¶24 The evidence leads to one reasonable conclusion: Chase knew Snap-On owned the equipment, even if it was not being diligent in repossessing it. He knew that he was in arrears and that under the lease contract he could not sell the equipment until he had paid off the lease.[36] He knew that Fox and Gjersee wanted the equipment back, yet he continued to try to sell it to Black. The evidence does not support giving a good faith claim of title instruction.

¶25 We affirm.

GROSSE and DWYER, JJ., concur.

Review denied at 160 Wn.2d 1022 (2007).

---

[35] *Id.*

[36] "One who accepts a written contract is conclusively presumed to know its contents and to assent to them." *Tjart v. Smith Barney, Inc.*, 107 Wn. App. 885, 897, 28 P.3d 823 (2001), *review denied*, 145 Wn.2d 1027, *cert. denied*, 537 U.S. 954 (2002).