FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2015 JUN 22 AM 9: 00

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71449-0-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KEVIN RICHARD HUBBARD, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: June 22, 2015 |
| | ) | |

VERELLEN, A.C.J. — Kevin Hubbard appeals his convictions for three counts of attempted murder involving a shooting in the parking lot of a downtown nightclub. He contends that a witness testified without being sworn and that the trial court improperly admitted lay testimony about locations of cell phone towers that were activated by his cell phone, excluded other suspect evidence, refused to give a lesser included instruction on first degree assault, and gave an accomplice instruction. Finding no error, we affirm.

## FACTS

Late one night in January 2012, police responded to 911 calls reporting several shots fired near the Citrus Lounge, located in the South Lake Union neighborhood of Seattle. Officers encountered a chaotic scene, with a large hostile crowd. Three men had been shot in the parking lot of the Fred Hutchinson Cancer Center across the

street from the Citrus Lounge. The victims were identified as Zealand Adams, Romeo Bone, and Daniel Wilson.

The victims were found near two vehicles: Adams' black Dodge Magnum and a white sports utility vehicle (SUV).[1] Both vehicles had several shotgun holes and several spent assault rifle casings and a few nine millimeter casings were scattered in the parking lot. Police also found a discarded nine millimeter handgun in the bushes near the scene.

Two security cameras posted in the area recorded the shooting. The video images are of poor quality, and individual faces are not discernible. Police were only able to identify the victims and other individuals in the video by their clothing, as described by the victims and one of the suspects.

One of the security videos filmed the parking lot where the Magnum and white SUV were parked. A retaining wall is directly in front of the vehicles and beyond the wall are a line of bushes, a sidewalk, and Yale Avenue. The other video filmed Yale Avenue, on the other side of the bushes bordering the parking lot.

The video from the parking lot shows Bone getting into the driver's seat of the Magnum. Wilson and Adams then walk toward the Magnum. When they reach the rear of the car, a shot is fired, and the bullet hits the ground directly behind them. Adams ducks and runs to the passenger side of the Magnum, behind the white SUV. Wilson tries to take cover on the other side of the white SUV, but the shooting continues. Wilson falls to the ground and eventually crawls to the driver's side of the

---

[1] The white SUV parked in the lot was a Lexus, but will be referred to simply as the white SUV to avoid confusion with a white Lexus sedan also involved in the crime.

Magnum. A few more shots are fired. Bone emerges from the Magnum, sits on the rear bumper briefly, wanders into the middle of the parking lot, and then collapses. Adams reappears, wounded.

The other video of Yale Street shows a white Lexus sedan drive up Yale Avenue and park. The passenger exits the car first and is joined by the driver. The driver appears to retrieve something from the car after exiting. The two walk together down Yale Avenue and stop behind the bushes. One of them appears to be shooting at the victims. The other person runs back toward the white Lexus sedan.

After the police arrived, all three victims were admitted to Harborview Medical Center with serious injuries. Wilson's injured leg ultimately required amputation.

Following the shooting, Detective Benjamin Hughey interviewed the victims. Bone declined to answer any questions. Adams described a fight inside the club and said he got into a physical fight with someone known as "B-12," but did not know who shot him. Wilson did not remember who shot him. Hughey also interviewed Wilson's brother Khris,[2] who said that "he heard 'on the street' that one of the shooters might be called '12' or 'B-12."[3] In later interviews, Wilson and Khris both stated that they heard that someone who goes by "Lil Hev" shot Wilson.

Hughey knew "B-12" to be Benjamin Palmer and "Lil Hev" to be Daunte Williams. When shown montages that included Palmer and Wilson, neither of the Wilson brothers identified Palmer, but Wilson identified Williams as someone "he believed" was at the Citrus Lounge on the night of the shooting and that he knew as

---

[2] To avoid confusion, Wilson's brother will be referred to by his first name.

[3] Clerk's Papers (CP) at 9.

"Lil Hev."[4] Shown a single picture of Williams, Adams said he thought he recognized Williams as one of the shooters and that he had met him recently as "Lil Hev."

Hughey then contacted Williams. Williams denied having been at the Citrus Lounge that night, provided contact information for an alibi witness, and offered his cell phone records. Those records indicated that a phone owned by Williams was in Tukwila at the time of the shooting.

A confidential informant (CI) also provided information that the suspects in the shooting were James Henderson and Kevin Hubbard. Hughey obtained a search warrant for cell phone records for these suspects and determined that both of their cell phones used a series of cell phone towers beginning near the Citrus Lounge just before the shooting, continuing southbound in the hours that followed. Hughey then arranged for a CI to meet with Henderson and record a conversation. Henderson described the shooting to the CI. Based on that conversation, Hughey determined that Henderson was at the shooting but was not the shooter.

In April 2012, police arrested and federally charged Henderson in connection with the rifle that was used at the Citrus Lounge shooting. The assault rifle and associated magazine used in the shooting were recovered as part of a separate operation involving illegal gun sales conducted by Seattle police and federal agents. Henderson was not associated with the sale of that particular rifle, but Detective Hughey interviewed him after his arrest about the Citrus Lounge shooting. Hughey told Henderson that there was strong evidence tying him to the shooting and

---

[4] Id.

eventually gave a statement admitting to his involvement. Henderson stated that he was with Hubbard and that Hubbard was the shooter.

Hughey then arrested and interviewed Hubbard. Hubbard admitted to driving to the Citrus Lounge with Henderson in a white Lexus sedan. Police searched that car and found evidence that a bullet struck the rear bumper of the vehicle at a low angle, consistent with someone shooting from below. Hubbard admitted to participating in a fight inside the club and said that he was punched on his way out of the club, but claimed that before the shooting, he left the club alone to attend the birth of his child in Tacoma.

The State charged Hubbard with three counts of attempted first degree murder with firearm enhancements, and the case proceeded to trial. Over defense objection, the trial court permitted Hughey to testify about the locations of the cell phone towers that Hubbard's and Henderson's phones used following the shooting, without being qualified as an expert. The trial court also excluded evidence relating to the investigation of Williams as a possible suspect in the shooting. Henderson testified against Hubbard, consistent with his statement to Hughey. Adams did not testify. Bone and Wilson testified, but could not identify the shooter or the other person with the shooter. Hubbard did not testify.

The trial court declined to provide a lesser included offense instruction on first degree assault, but gave an instruction on accomplice liability. The jury found Hubbard guilty as charged, and he was sentenced to 913.25 months of confinement. Hubbard appeals.

## DISCUSSION

### Sworn Testimony

Hubbard first contends that the trial court's failure to swear in Henderson before he testified amounts to reversible error. He points out that before the direct examination of Henderson, the verbatim report of proceedings specifically notes that the witness was not sworn in on the record. He further relies on the audio recording of the proceeding, which does not include Henderson being sworn in.

ER 603 provides:

> Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so.

But the trial court clerk's minutes unequivocally state that Henderson was sworn. Those minutes state as follows:

| | |
|---|---|
| 9:14:43 | Defense motion and argument to suppress hearsay testimony from witness.<br>State's Exhibit 57 ...........ID ONLY |
| 9:28:01 | Recess |
| 9:35:09 | Resume. Jury absent. Witness James Henderson present with counsel, Juanita Holmes. Exhibit 57 played for witness identification. |
| 9:36:36 | Court admonishes spectators regarding personal recording of witness testimony. *James Henderson sworn* and examined on behalf of State<br>State's Exhibit 58, 59 .................ADMITTED |
| 10:40:26 | Jury absent. Defense objection to State's line of questioning. Court lets previous ruling stand. Argument regarding identification of defendant |
| 10:52:06 | Defense Motion for Mistrial—DENIED. Recess |

11:20:28    Resume.  Direct examination of James Henderson continues[5]

The audio recording clearly reflects that the court took a recess while waiting for Henderson to arrive. When the audio recording recommenced, the prosecutor indicated for the record that Henderson had identified the voice in the recorded conversation contained in exhibit 57 outside the presence of the jury. The jury was then called in, and the State proceeded with direct examination of Henderson.

Hubbard has the burden of establishing that Henderson was not sworn. He notes that the specific time reference on the clerk's minutes indicating Henderson was sworn at 9:36 does not match up with the contents of the audio recording at the audio recording time stamp for 9:36 a.m. But the prosecutor's summary on the audio recording after the recess is consistent with the sequence contained in the clerk's minutes that the court took a recess, Henderson then arrived and identified the voice in the recording outside the jury's presence, the jury was then called in, and the prosecutor began direct examination of Henderson. The reference in the clerk's minutes that he was "sworn" is consistent with the information on the audio recording that the court took a recess, Henderson arrived, and he then testified about the voice identification, which was off the record and outside the presence of the jury. On this record, Hubbard does not establish that the trial court failed to swear in Henderson before he testified.

The notation in the verbatim report of proceedings and the accompanying audio recording simply indicate that he was not sworn in "on the record." The rule does not

---

[5] CP at 455.

require that a witness be sworn in on the record or even in the presence of the jury; it simply requires that it be "by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so."[6] And here, it appears there was a reason Henderson was not sworn in before the jury: he needed to first give sworn testimony identifying his voice outside the jury's presence before testifying on direct examination about his recorded conversation. While his testimony outside the presence of the jury was not put on the record, the clerk's minutes adequately establish that he was sworn in before testifying.

*Testimony about Cell Phone Towers*

Hubbard next contends that the trial court was required to qualify Detective Hughey as an expert before permitting him to testify about the locations of cell towers used by the suspects' phones. We disagree.

"The admissibility of expert testimony lies within the sound discretion of the trial court."[7] ER 702 permits expert testimony as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Detective Hughey's testimony was based on the phone records provided by the cell phone companies, which consisted of call logs, numbers called, ingoing and outgoing calls, duration, time/date stamp of the call, and the cell phone towers that were activated at the beginning and end of each call. The records provided a

---

[6] ER 603.

[7] State v. Fagundes, 26 Wn. App. 477, 483, 614 P.2d 190 (1980).

"decipher key" to determine the physical address of each tower. Hughey created Excel spreadsheets summarizing the relevant information from these records.

Hughey supplied the names associated with the phone numbers in the call log, which he obtained from the contact list in Hubbard's phone, and the exact addresses of the towers as provided by the cell phone companies. He then plotted the addresses of those towers on a Google map to visually depict their locations and the time that they were activated by Hubbard's or Henderson's phone.

Before Hughey testified, Hubbard objected to his testimony about the cell phone records on the basis that Hughey was not qualified as an expert. The trial court ruled that Hughey's testimony did not require any expertise because it was simply about the locations of the cell towers that were activated:

> [A]s to the locations of those towers, that's clearly shown on what I think are marked Exhibits 75 and 76 [map created by Hughey], which I—and so simply typing that into a map feature or, you know, something like Google maps is something that anyone can do and I don't think it takes expertise. And simply reflecting what time those towers were used in relation to a cell phone call again I don't think takes any expertise. It's just based on—not to diminish Detective Hughey's role in creating that, but that's just data entry is really all I see that as.[8]

Hughey then testified that, according to the cell phone records, Hubbard's phone activated a cell tower near the Citrus Lounge four minutes before the shooting, his phone activated a tower south of downtown Seattle minutes after the shooting, and minutes after that, it activated a tower farther south, near Tukwila. Hubbard's phone then activated three towers in Renton and continued to activate towers every few

---

[8] Report of Proceedings (RP) (Oct. 23, 2013) at 2007. The court did express concern about a line on the map that appeared to show a route and advised the State to make clear to the jury that the line had no significance.

minutes in southward direction, until the phone activated a tower in Tacoma at 2:53 a.m. Henderson's phone also activated a tower near the Citrus Lounge shortly before the shooting and thereafter activated towers in downtown Seattle, south of downtown, and southward.

Hughey testified that the cell phone records could not show where the cell phones were actually located at any point, just that they were "in range" of the tower:

> It does not give you an exact address of a cell phone. This isn't GPS pinging, as the movies might try to make you believe. It just means that the cell phone is within the cellular footprint of that tower, and as you move from one footprint to the next, you move between cell towers.[9]

Hughey also explained that a purple line on the map appearing to connect each of the towers on the map was automatically generated by Google and that it did not indicate the route taken by the phones or have any other meaning.

Hughey further testified that when he confronted Hubbard with the cell phone records indicating that he and Henderson traveled south from the Citrus Lounge together, Hubbard suggested that Henderson probably just left his phone in the car Hubbard was driving. Hughey also testified that the cell phone records showed that Henderson's phone was being used for both incoming and outgoing calls during the time that the records indicated Hubbard's phone was activating towers southward.

Hubbard fails to show the trial court abused its discretion by admitting Hughey's testimony without qualifying him as an expert. Hubbard relies on United States v. Harrell,[10] and United States v. Yeley-Davis,[11] neither of which support his argument.

---

[9] RP (Oct. 29, 2013) at 2523.

[10] 751 F.3d 1235 (11th Cir. 2014).

[11] 632 F.3d 673 (10th Cir. 2011).

In Harrell, the court held that the trial court abused its discretion by permitting a detective to testify about the relationship and interaction between cell phones and cell phone towers.[12] Specifically, the detective testified about how a cell tower receives a transmission when someone places or receives a call on a cell phone. He stated that "the phone sends out a signal to the nearest, most of the time, the nearest tower," and that this tower will then call the number the caller is trying to reach.[13] He explained that a cell tower has three sides and that a call will register on the side of the tower where the phone is actually located, although the cell phone is not necessarily right next to the cell tower.

Detective Jacobs testified that he visited the three cell tower locations that had been "hit" by the cell phone number linked to a codefendant. He also created maps which showed the towers, as well as the Walgreens and McDonald's which had been robbed.[14] He testified that the cell phone was in the area of the businesses just prior to the two robberies.[15]

But Harrell did not address the issue presented here, as the court expressly declined to decide whether a witness who testified about cell records must qualify as an expert.[16] Rather, because the State tendered the witness as an expert and the trial court certified him as an expert, permitting him to offer his expert opinion, the issue was whether that witness was indeed qualified as an expert. The court held that he

---

[12] Id. at 1242.

[13] Id. at 1243.

[14] Id.

[15] Id.

[16] Id.

11

was not, and that it was therefore an abuse of discretion to admit the testimony.[17]

Here, the State did not tender Hughey as an expert, nor did the trial court certify him as an expert. Thus, Harrell does not apply.

In Yeley-Davis, the court held that an agent gave expert testimony when describing how cell towers work.[18] There, the agent explained an apparent discrepancy in the cell phone records which included an unexplained phone call to an unidentified number. The agent testified that the number belonged to a co-conspirator, explaining that a tower may assign a new number if a user travels outside of the user's assigned area.[19] The court concluded that "[t]he agent's testimony concerning how cell phone towers operate constituted expert testimony because it involved specialized knowledge not readily accessible to the ordinary person."[20]

But here, Hughey did not testify about how cell phone towers operate. Rather, he simply testified that he reviewed cell phone records that identified the location of cell towers for each call. Such testimony did not require any specialized knowledge. The trial court did not abuse its discretion by allowing him testify without qualifying him as an expert.

*Other Suspect Evidence*

Hubbard next challenges the trial court's exclusion of evidence showing that Williams ("Lil Hev") was a possible suspect in the shooting. Hubbard fails to show that

---

[17] Id.

[18] 632 F.3d at 684.

[19] Id.

[20] Id.

the trial court's ruling was an abuse of discretion.

This court reviews a trial court's decision to exclude evidence for an abuse of discretion.[21] Criminal defendants have a constitutional right to present a defense consisting of relevant, admissible evidence.[22] A criminal defendant seeking to admit evidence suggesting that another person committed the crime bears the burden of establishing its admissibility.[23] Other suspect evidence is relevant if it tends to connect someone other than the defendant with the crime.[24] "[S]ome combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime."[25] But "a trial court cannot exclude defense-proffered other suspect evidence because of the perceived strength of the State's case."[26]

Here, the other suspect evidence offered by Hubbard consisted of Hughey's investigation of Williams, a possible suspect based on information heard "on the street." Wilson identified Williams as someone "he believed" was at the Citrus Lounge on the night of the shooting, and as a man he knows as "Lil Hev."[27] Adams told Hughey that he thought he recognized him as one of the shooters, but only after hearing the rumor and being shown a single picture of Williams. Williams denied

---

[21] State v. Perez-Valdez, 172 Wn.2d 808, 814, 265 P.3d 853 (2011).

[22] State v. Maupin, 128 Wn.2d 918, 924, 913 P.2d 808 (1996).

[23] State v. Pacheco, 107 Wn.2d 59, 67, 726 P.2d 981 (1986).

[24] State v. Franklin, 180 Wn.2d 371, 381, 325 P.3d 159 (2014).

[25] Id.

[26] Id. at 378.

[27] CP at 9.

being at the scene or even in Seattle that night, and his cell phone records showed that his cell phone was in Tukwila at the time of the shooting.

The court concluded that Hubbard would not be permitted to introduce this other suspect evidence because he had not shown that Williams had taken any steps indicating an intent to commit the crime, noting that it was based purely on rumor. But the court did note that it would be willing to reserve ruling on that issue if the defense had not had a chance to talk to the people involved. Defense counsel responded that he had not yet spoken with Adams, that he was not confident that Adams would testify at all, and acknowledged that the reliability of Adams' statements was questionable, given his refusal to cooperate. The court then ruled it was "essentially granting the State's motion," but left it open if at some point the defense had evidence to warrant revisiting the issue.[28]

Hubbard never revisited the issue and did not present additional statements from Adams or further evidence establishing Williams as a possible suspect. Indeed, Adams did not testify at trial. Thus, other than the "word on the street" that "Lil Hev" was the shooter, the only evidence of Williams' connection to the crime was Adam's subsequent equivocal statement that he "thought" he recognized Williams as one of the shooters. Adams made that statement after initially stating that he did not know the shooter and then being shown a single picture of Williams after he heard the rumor that Williams was the shooter.

---

[28] RP (Oct. 3, 2013) at 234.

Without more, Hubbard fails to show that the trial court abused its discretion by concluding that there was not sufficient evidence connecting Williams to the crime to be offered as other suspect evidence. Additionally, as defense counsel acknowledged, the reliability of Adams' statements was questionable. Such evidence is at most speculative, and its exclusion was not an abuse of discretion

## *Jury Instructions*

Hubbard contends that the trial court erred by giving an accomplice instruction because the evidence was insufficient to convict him under that theory. We disagree.

A trial court's decision to give a particular jury instruction is reviewed for an abuse of discretion.[29] Each party is entitled to have the jury instructed on its theory of the case if there is sufficient evidence to support that theory.[30] To determine whether the evidence was sufficient to support the instruction, this court must view the evidence in the light most favorable to the party requesting the instruction.[31]

Consistent with RCW 9A.08.020(3)(a)(i),(ii), the trial court instructed the jury on accomplice liability as follows:

> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she:
>
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
>
> (2) aids or agrees to aid another person in planning or committing the crime.

---

[29] State v. Chase, 134 Wn. App. 792, 803, 142 P.3d 630 (2006).

[30] State v. Williams, 132 Wn.2d 248, 259, 937 P.2d 1052 (1997).

[31] State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.[32]

Hubbard contends this instruction is not supported by the State's theory that he was either the shooter or the other person with the shooter because there was no accomplice to the shooter. He asserts that the evidence shows that the person who was not the shooter simply ran away when the shooting began and therefore, the State could not prove that person aided or encouraged the shooter. Thus, he contends, there was only a principal and no accomplice and the instruction was improper. The record does not support this contention.

Viewed in the light most favorable to the State, the evidence supports a theory of accomplice liability. Even if the jury did not believe that Hubbard was the shooter, there was evidence that Hubbard was the driver. Henderson testified that Hubbard was the driver, and Hubbard admitted to driving the Lexus sedan to and from the club that evening. The video showed that the driver exited the car and appeared to retrieve something from inside the vehicle. He joined the passenger behind the bushes and then the shooting began. Even if Hubbard was not the shooter, there was sufficient evidence to show that he encouraged and aided the shooting by driving the shooter to and from the scene.

---

[32] CP at 215.

Hubbard contends that, even if he were the driver, he was still simply the principal, not an accomplice, because the driver was the shooter. But the evidence is not conclusive that the shooter was in fact the driver, and the jury was not compelled to draw this inference from the facts presented. Hubbard asserts that "[w]hen the shooter, who appears to be the person who had exited the driver's side of the Lexus earlier, begins shooting, the person who was the passenger, 'after the first round's fired, takes two steps, and then runs out of the frame,'" citing Detective Hughey's testimony about what the surveillance video depicts.[33] But this is not an accurate characterization of the testimony.

Rather, Detective Hughey testified that once the two suspects exited the car and walked over to the bushes, they became "an intermixed blob" because they were difficult to see from "so far away."[34] He further testified that "[d]uring the actual shooting, you will see *one of the two of them*, after the first round's fired, take a couple steps and then immediately run out of frame while the shooting's still going on."[35] While he later refers to "the passenger" as the one who was running away,[36] the video itself does not conclusively establish that the passenger was in fact the person running away and that the driver was the shooter. Indeed, in opening statements, Hubbard acknowledged that the videotape "will be very unclear, and it will not be enough to pinpoint anybody as the shooter."[37] Thus, the jury was entitled to discredit Hughey's

---

[33] Appellant's Br. at 37.

[34] RP (Oct. 29, 2013) at 2490.

[35] Id. (emphasis added).

[36] Id. at 2492, 2494.

[37] RP (Oct. 9, 2013) at 16.

reference to the passenger as the one running away and give more weight to his earlier testimony that the two were an "intermixed blob" once the shooting began and the video simply showed that "one of the two" was the shooter.

Finally, Hubbard challenges the trial court's refusal to give a lesser included offense instruction on first degree assault. A defendant is entitled to an instruction on a lesser included offense if the following two conditions are met, otherwise known as the legal and factual prongs set forth in State v. Workman: "First, each of the elements of the lesser offense must be a necessary element of the offense charged. Second, evidence in the case must support an inference that the lesser crime was committed."[38] In other words, "if it is possible to commit the greater offense without committing the lesser offense, the latter is not an included crime.[39] In State v. Harris, our State Supreme Court held that assault is not a lesser included offense of attempted murder because the legal prong of Workman has not been met.[40] The Court reasoned that the substantial step required to prove attempted murder does not necessarily require commission of an assault.[41]

Hubbard contends that Harris is no longer good law after State v. Berlin.[42] Hubbard asserts that because Berlin requires that the court consider the crimes as charged when determining whether a lesser included instruction is appropriate, Harris's categorical pronouncement that assault cannot be a lesser included offense of

---

[38] 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978) (citations omitted).

[39] State v. Harris, 121 Wn.2d 317, 320, 849 P.2d 1216 (1993).

[40] 121 Wn.2d 317, 321, 849 P.2d 1216 (1993).

[41] Id.

[42] 133 Wn.2d 541, 947 P.2d 700 (1997).

attempted first degree was improper. Rather, he contends, as proved here, the shootings necessarily proved the assault.

Hubbard misreads Berlin. Berlin did not change the lesser included offense analysis requiring that both legal and factual prongs are met. Rather, in determining the legal prong, Berlin instructed that the alternative means crime be considered as charged, rather than the statutory scheme as a whole.[43] Berlin overruled State v. Lucky, where the Court held that to satisfy the legal prong of Workman, each of the elements of the lesser offense must be a necessary element not only of the offense as charged, but also an element of each alternative means of committing the offense.[44] Harris is consistent with the Berlin holding. Harris, like this case, involved attempted murder, which is not an alternative means crime, and the Court considered first degree murder "[a]s charged in this case."[45] The Court has also acknowledged the viability of Harris after Berlin in State v. Turner, holding that the trial court properly declined to instruct the jury on fourth degree assault as a lesser included offense of attempted first degree murder.[46]

More recently, in State v. Boswell, Division II of this court rejected the same argument advanced here by Hubbard:

---

[43] Id. at 548 ("Only when the lesser included offense analysis is applied to the offenses as charged and prosecuted, rather than to the offenses as they broadly appear in statute, can both the requirements of constitutional notice and the ability to argue a theory of the case be met.").

[44] 128 Wn.2d 727, 732, 912 P.2d 483 (1996).

[45] 121 Wn.2d at 320.

[46] 143 Wn.2d 715, 729-30, 23 P.3d 499 (2001) ("This Court has previously held that assault is not a lesser included offense of attempted murder in the first degree.") (citing Harris, 121 Wn.2d at 321).

Attempt is not an alternative means crime. Therefore, the clarification articulated in *Berlin* does not apply. *Berlin* does not change or undermine the analysis employed by our Supreme Court in *Harris*.

Furthermore, nothing in *Berlin* stands for the proposition that we are required to examine the elements of the offense based on the alleged facts supporting the charge. Rather, *Berlin* is clear—when examining the legal prong of the *Workman* test we look at the statutory elements of the crime to determine whether each element of the lesser offense is a necessary element of the charged offense. We do not examine the facts underlying the charge unless we reach the factual prong of the *Workman* test. Accordingly, contrary to Boswell's assertion, there is nothing in *Berlin* that supports deviating from the rule or analysis articulated by our Supreme Court in *Harris*. We hold that the trial court did not err in refusing to instruct the jury on third degree assault as a lesser included offense to attempted murder.[47]

Similarly here, first degree assault was not a lesser included offense of attempted first degree murder. The to convict instruction for the crime of attempted murder in the first degree required proof that the defendant did an act that was a "substantial step" toward the commission of first degree murder and that was done with intent to commit first degree murder.[48] The State's theory that the shooting was the substantial step was not part of the elements charged or necessary to convict. Thus, Berlin did not require the trial court to consider how the State sought to prove attempted murder; the court was required only to consider the statutory elements in its analysis of the legal prong of Workman. Under Harris and Turner, the court properly refused to instruct the jury that first degree assault is a lesser included offense of attempted first degree murder.

---

[47] 185 Wn. App. 321, 335, 340 P.3d 971 (2014) (citations omitted).

[48] CP at 216.

Hubbard further contends in his reply brief that <u>Harris</u> cannot be reconciled with <u>In re Personal Restraint of Orange</u>, which held that convictions for first degree assault and first degree attempted murder based on the same shooting violated double jeopardy.[49] But Hubbard cites no authority that this double jeopardy analysis applies in deciding whether the <u>Workman</u> legal prong has been met for a lesser included instruction. Accordingly, we reject this argument.[50]

We affirm.

WE CONCUR:

---

[49] 152 Wn.2d 795, 818-19, 100 P.3d 291 (2004).

[50] Additionally, we note that while Hubbard mentions <u>Orange</u> in a footnote in his opening brief, he did not develop this argument until the reply brief, which is too late to warrant consideration. <u>Cowiche Canyon Conservancy v. Bosley</u>, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).