# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52061-3-II |
| Respondent, | |
| v. | |
| JEREMY BLAINE FENNEY, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, C.J. — Jeremy B. Fenney was convicted of over 40 crimes, including human trafficking, promoting prostitution, rape, assault, kidnapping, robbery, felony harassment, unlawful imprisonment, unlawful possession of a firearm, possession of a stolen firearm, possession of a controlled substance, violation of a court order, and tampering with a witness. Fenney appeals and argues that he is entitled to a new trial because the State introduced improper expert witness testimony, he received ineffective assistance of counsel, the trial court erred by denying his motion to sever, the trial court violated the appearance of fairness doctrine, the trial court erred by admitting evidence of gang affiliation, and he was denied a fair trial by an impartial judge. Fenney's arguments to support his claim for a new trial fail.

Fenney also challenges several of his individual convictions. Specifically, Fenney argues that the human trafficking charges were racially motivated. Fenney also argues that the charges for both first degree human trafficking and promoting prostitution were improper because the statutes are concurrent. And he argues that there is insufficient evidence to support his convictions

for felony harassment, second degree assault, and robbery. Finally, Fenney argues that the three counts of kidnapping merge with his conviction for first degree human trafficking.

We decline to address Fenney's challenge based on racial bias. We hold that the first degree trafficking and promoting prostitution statutes are not concurrent, and sufficient evidence supports the convictions for felony harassment and second degree assault. We further hold that there is insufficient evidence to support the conviction for robbery, and the three kidnapping convictions merge with the first degree human trafficking conviction. Accordingly, we reverse Fenney's conviction for robbery and we hold that the three convictions for kidnapping merge with Fenney's conviction for first degree human trafficking. We affirm the remainder of Fenney's convictions. We remand for the trial court to vacate Fenney's conviction for robbery and three convictions for kidnapping[1] and for resentencing.[2]

FACTS

A.    CONDUCT AND CHARGES

Fenney and B.C.[3] were dating in March 2016, and lived together between March and November 2016. About a week after Fenney and B.C. began dating, Fenney told B.C. that he would leave the girl that he was then living with if B.C. would post on Backpage[4] and go on

---

[1]  Specifically, we reverse Fenney's convictions for counts 6, 17, 19, and 22.

[2]  Fenney also argues that his sentence was clearly excessive and the trial court erred by imposing certain legal financial obligations (LFOs). Because we remand for resentencing, we do not address these arguments.

[3]  We use initials to protect the privacy of sexual assault victims.

[4]  Backpage was a classified advertisement website that included an "escorts" section. *J.S. v. Vill. Voice Media Holdings, L.L.C.*, 184 Wn.2d 95, 98-99, 359 P.3d 714 (2015).

prostitution calls to earn money. Fenney's plan was for B.C. to go on a certain number of calls per day for six months and give the money she earned to him. B.C. began posting ads the next day after Fenney told her his plan and began going on prostitution calls; she posted about 200 Backpage ads. B.C. gave the money she earned from her calls to Fenney.

Soon after B.C. became a prostitute, Fenney began to beat, burn, cut, sexually abuse, imprison, and threaten to kill B.C. if B.C. did not do as Fenney said or if she tried to leave him. In addition to the acts of violence against B.C., Fenney committed acts of violence against K.W., another member of Fenney's household. Fenney robbed K.W., held a gun to her head, threatened to kill her, and forced her to have sex with him.

On January 22, 2018, the State charged Fenney by fourth amended information[5] with 45 counts as follows:

| Count | Charge | Date | Victim | Special Allegations | Aggravating Circumstance |
|---|---|---|---|---|---|
| 1 | Human Trafficking in the First Degree RCW 9A.40.100(1) | On or between 3/1/16 and 11/22/16 | B.C. | • Armed with Firearm • Domestic Violence | • Domestic Violence • Lack of Remorse • Deliberate Cruelty |
| 2 | Promoting Prostitution in the First Degree RCW 9A.88.070(1) | On or between 3/1/16 and 11/22/16 | B.C. | • Armed with Firearm • Domestic Violence | • Domestic Violence • Lack of Remorse • Deliberate Cruelty |
| 3 | Rape in the First Degree RCW 9A.44.040 | On or between 3/28/16 and 3/29/16 | B.C. | • Armed with Firearm • Domestic Violence | • Domestic Violence |

---

[5] The State's initial information was filed on November 17, 2016.

| | | | | | |
|---|---|---|---|---|---|
| 4 | Assault in the First Degree RCW 9A.36.011(1)(a) | On or between 3/28/16 and 3/29/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty |
| 5 | Harassment (Felony) – Threat to Kill RCW 9A.46.020(1) and (2) | On or between 3/28/16 and 3/29/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty |
| 6 | Kidnapping in the First Degree RCW 9A.40.020(1) and RCW 9A.40.010(2) | On or about 4/9/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty |
| 7 | Assault in the Second Degree RCW 9A.36.021(1)(c) | On or about 4/9/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty<br>• Lack of Remorse |
| 8 | Assault in the Second Degree RCW 9A.36.021(1)(f) | On or about 4/9/16 | B.C. | • Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty<br>• Lack of Remorse |
| 9 | Harassment (Felony) – Threat to Kill RCW 9A.46.020(1) and (2) | On or about 4/9/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty<br>• Lack of Remorse |
| 10 | Assault in the First Degree RCW 9A.36.011(1)(a) | On or between 4/1/16 and 6/1/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty<br>• Lack of Remorse |
| 11 | Harassment (Felony) – Threat to Kill | On or between 4/1/16 | B.C. | • Armed with Firearm | • Domestic Violence |

4

| | | | | | |
|---|---|---|---|---|---|
| | RCW 9A.46.020(1) and (2) | and 6/1/16 | | • Domestic Violence | • Deliberate Cruelty<br>• Lack of Remorse |
| 12 | Unlawful Imprisonment RCW 9A.40.040 and 9A.40.010(1) | On or between 5/1/16 and 5/12/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty |
| 13 | Assault in the First Degree RCW 9A.36.011(1)(a) | On or between 5/1/16 and 5/12/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty |
| 14 | Assault in the Second Degree RCW 9A.36.021(1)(a) | On or between 5/1/16 and 5/12/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence |
| 15 | Rape in the First Degree RCW 9A.44.040 | On or between 8/20/16 and 8/21/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty |
| 16 | Assault in the Second Degree RCW 9A.36.021(1)(f) | On or between 9/1/16 and 9/30/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty<br>• Lack of Remorse |
| 17 | Kidnapping in the first Degree RCW 9A.40.020(1) and 9A.40.010(2) | On or between 9/1/16 and 9/30/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty |
| 18 | Assault in the Second Degree RCW 9A.36.021(1)(c) | On or between 9/1/16 and 9/30/16 | B.C. | • Armed with Firearm<br>• Domestic Violence | • Domestic Violence<br>• Deliberate Cruelty |
| 19 | Robbery in the First Degree | On or between 10/5/16 | B.C. | • Armed with Firearm | • Domestic Violence |

| | | | | | |
|---|---|---|---|---|---|
| | RCW 9A.56.200(1) and 9A.56.190 | and 10/6/16 | | • Domestic Violence | |
| 20 | Assault in the Second Degree RCW 9A.36.021(1)(f) | On or between 10/5/16 and 10/6/16 | B.C. | • Armed with Firearm • Domestic Violence | • Domestic Violence • Deliberate Cruelty |
| 21 | Assault in the Second Degree RCW 9A.36.021(1)(f) | On or between 10/5/16 and 10/6/16 | B.C. | • Armed with Firearm • Domestic Violence | • Domestic Violence • Deliberate Cruelty |
| 22 | Kidnapping in the First Degree RCW 9A.40.020(1) and 9A.40.010(2) | On or between 10/5/16 and 10/6/16 | B.C. | • Armed with Firearm • Domestic Violence | • Domestic Violence • Deliberate Cruelty |
| 23 | Rape in the First Degree RCW 9A.44.040 | On or between 10/5/16 and 10/6/16 | B.C. | • Domestic Violence | • Domestic Violence • Deliberate Cruelty |
| 24 | Assault in the First Degree RCW 9A.36.011(1)(a) | On or between 10/5/16 and 10/6/16 | B.C. | • Sexual Motivation • Domestic Violence | • Domestic Violence • Deliberate Cruelty |
| 25 | Assault in the First Degree RCW 9A.36.011(1)(a) | On or between 10/5/16 and 10/6/16 | B.C. | • Armed with Firearm • Domestic Violence | • Domestic Violence • Deliberate Cruelty |
| 26 | Harassment (Felony) – Threat to Kill RCW 9A.46.020(1) and (2) | On or between 10/5/16 and 10/6/16 | B.C. | • Armed with Firearm • Domestic Violence | • Domestic Violence • Deliberate Cruelty |
| 27 | Attempted Murder in the First Degree RCW 9A.32.030(1)(a) and 9A.28.020(1) | On or about 10/6/16 | B.C. | • Armed with Firearm • Domestic Violence | • Domestic Violence • Deliberate Cruelty |

| 28 | Assault in the First Degree RCW 9A.36.011(1)(a) | On or about 10/6/16 | B.C. | • Armed with Firearm • Domestic Violence | • Domestic Violence • Deliberate Cruelty |
|---|---|---|---|---|---|
| 29 | Assault in the Fourth Degree RCW 9A.36.041(1) | On or between 11/1/16 and 11/22/16 | B.C. | • Domestic Violence | |
| 30 | Unlawful Possession of a Firearm in the first Degree RCW 9.41.040(1)(a) | On or between 10/1/16 and 11/22/16 | | | |
| 31 | Unlawful Possession of a Firearm in the First Degree RCW 9.41.040(1)(a) | On or between 10/1/16 and 11/22/16 | | | |
| 32 | Possession of a Controlled Substance – Methamphetamine RCW 69.50.4013 and 69.50.206(d)(2) | On or about 11/22/16 | | | |
| 33 | Violation of a Court Order (Felony) (July 24, 2015 and after) RCW 26.50.110 | On or about 11/25/16 | | • Domestic Violence | |
| 34 | Violation of a Court Order (Felony) RCW 26.50.110 | On or about 12/9/16 | | • Domestic Violence | |
| 35 | Violation of a Court Order (Felony) RCW 26.50.110 | On or about 1/22/17 | | • Domestic Violence | |
| 36 | Violation of a Court Order (Felony) RCW 26.50.110. | On or about 1/23/17 | | • Domestic Violence | |
| 37 | Violation of a Court Order (Felony) RCW 26.50.110 | On or about 1/23/17 | | • Domestic Violence | |
| 38 | Robbery in the First Degree | On or between 7/1/16 | K.W. | • Armed with Firearm | |

| | | | | | |
|---|---|---|---|---|---|
| | RCW 9A.56.200(1) and 9A.56.190 | and 9/30/16 | | | |
| 39 | Assault in the Second Degree RCW 9A.36.021(1)(c) | On or between 7/1/16 and 9/30/16 | K.W. | • Armed with Firearm | |
| 40 | Harassment (Felony) – Threat to Kill RCW 9A.46.020(1) | On or between 7/1/16 and 9/30/16 | K.W. | • Armed with Firearm | |
| 41 | Unlawful Imprisonment RCW 9A.40.040 and 9A.40.010(1) | On or between 7/1/16 and 9/30/16 | K.W. | • Armed with Firearm | |
| 42 | Rape in the First Degree RCW 9A.44.040 | On or between 10/1/16 and 11/16/16 | K.W. | • Armed with Firearm | • Ongoing Pattern of Sexual Abuse |
| 43 | Unlawful Possession of a Firearm in the First Degree RCW 9.41.040(1)(a) | On or between 8/1/16 and 11/14/16 | | | |
| 44 | Tampering with a Witness RCW 9A.72.120 | On or between 11/22/16 and 1/31/17 | | | |
| 45 | Possessing a Stolen Firearm RCW 9A.56.310 and RCW 9A.56.140 | On or between 10/1/16 and 11/22/16 | | | |

B.     MOTION TO SEVER

Before trial began, Fenney filed a motion to sever the counts related to K.W. for trial. Fenney argued that the counts related to B.C. had been improperly joined with the counts related to K.W. because the victims were different. Fenney contended that B.C.'s allegations on the sex offenses had some level of independent verification, but K.W.'s claim of sexual violence was supported by no evidence other than K.W.'s word. Fenney also contended that the "[a]llegations that Fenney committed a rape against an additional victim other than [B.C.] would be prejudicial to his defense of [B.C.]'s claims." Clerk's Papers (CP) at 167.

The trial court denied the motion to sever. The trial court stated that the case was primarily a human trafficking case and the rapes and assaults would be relevant to human trafficking, and noted that an expert witness would testify about a pattern associated with human trafficking.

The trial court determined that K.W.'s testimony would be admissible under ER 404(b) because there was a common scheme or plan: "This is how pimps do their thing, if will you (sic). This is a common feature among traffickers and their victims." Verbatim Report of Proceeding (Dec. 11, 2017) at 10. The trial court found the evidence to be highly probative. The trial court acknowledged that there was a prejudicial effect because two women were alleging rape against the same man. However, that trial court explained:

> [T]he prejudice is what happens because of the crime.
>      This is part of, in my humble estimation of how you get to human trafficking in the first degree.
>      It's like how you get to classic domestic violence.
>      If you have an expert who otherwise testifies about that. And I've been assured that you do.
>      So and a limiting instruction can easily take care of that.

VRP (Dec. 11, 2017) at 10-11.

9

C. GANG AFFILIATION EVIDENCE

Also before trial began, the State filed a motion to admit gang affiliation evidence to show the victims' state of mind for the harassment charges. The State argued, "Evidence that the defendant is associated with a gang and that the defendant conveyed this information to the victims is directly relevant to B.C. and K.W.'s fear that the defendant would carry out the threats that he indicated." CP at 285. The State also argued that the evidence was "relevant for the jury to understand why K.W. and B.C. did not report these crimes to the police when they occurred. Both witnesses were afraid of retaliation from fellow gang members if they spoke to the police about the abuse they suffered at the hands of the defendant." CP at 285-86.

After hearing argument on the issue, the trial court stated:

> The way that I analyze this is two-fold. One, is this relevant information in the first place; and secondly, does there need to be a foundation laid?
> In the first course, the information would be relevant, certainly probative of the alleged victims' . . . state of mind, their fear and their fear of reprisals if they were seen to be communicating with police or prosecutors or hanging out anywhere near the courthouse, et cetera.
> That doesn't depend upon the truthfulness of their belief. It simply depends on whether there is a factual basis for their belief in terms of their credibility.
> So in terms of their—that issue, the evidence certainly has probative value. It is more likely that people can be terrorized into not talking if they are afraid that not only the perpetrator, but also the perpetrator's allies, can affect a violent reprisal for speaking.
>
> . . . .
>
> The prejudicial effect is minimized in that event by virtue of two things. One, you don't have independent corroboration of the belief system, thus bootstrapping, if you will, the alleged victim's belief with independent evidence saying, yes, he, in fact, was a member of this gang; and secondly, the prejudice is minimized by a limiting instruction to the jury that allows the jury to use this evidence in the way in which it is intended, and that is simply to explain why these two people delayed their reporting of these crimes—the alleged crimes or why they may have given different statements at different times.

> The second issue has to do with their reasonableness of the fear. That is an element of the crime that does not depend simply on the testimony but also depends on whether, from an objective standpoint, their fear was reasonable.

VRP (Jan. 22, 2018) at 63-65. The trial court ruled that no law enforcement witness could say that Fenney was in fact a member of a gang, but because the evidence would be highly relevant to the victims' state of mind and their fear, the alleged victims were free to testify as to what made them afraid. The trial court also ruled that the evidence would come in with a limiting instruction that would advise the jury that the evidence was admitted solely for the purposes of assessing the individual's credibility and state of mind.

D.      JURY TRIAL

The following evidence was presented at Fenney's jury trial.

1.      B.C.'s Testimony

B.C. met Fenney through Facebook in 2011, and they began dating right away. B.C. was aware that Fenney was a pimp; Fenney has a "True Northwest Pimp" tattoo across his chest. 5 VRP (Jan. 31, 2018) at 702. There was a period of time after they began dating in 2011 when they were not seeing each other, but they picked up their relationship again in late February or early March of 2016.

B.C. and Fenney began living together in March 2016. At first, they lived at Fenney's mother's house. While B.C. and Fenney were living at Fenney's mother's house, B.C. considered them boyfriend and girlfriend.

About a week after they began dating again in 2016, Fenney discussed with B.C. the idea of B.C. becoming a prostitute by suggesting she start posting ads on Backpage. Fenney stated that he would set a goal amount of money, and once they reached that goal, they would be done. B.C.

began posting ads on Backpage the day after they first discussed it. B.C. gave the money she earned going on prostitution calls to Fenney. The money was supposed to be for both of them, but Fenney kept the money. During B.C.'s time at Fenney's mother's house, B.C. used methamphetamine. Fenney gave B.C. the drugs.

Fenney would not allow B.C. to talk to anyone. With men, B.C. had to look at the floor and could not even acknowledge them.

Fenney would not allow B.C. to quit being a prostitute. There was one time when Fenney thought B.C. had not posted an ad on Backpage, and he started beating her, saying, "B[****], I will kill you if you do not get a call in the next 15 minutes." 5 VRP (Jan. 31, 2018) at 706. B.C. "freak[ed] out" because Fenney had a gun. 5 VRP (Jan. 31, 2018) at 706

B.C. was not free to leave Fenney's control because Fenney would hit her with a gun or bind her hands and head with duct tape to prevent her from leaving. Other times, Fenney would threaten to kill himself if B.C. tried to leave. Fenney also threatened to kill B.C.'s family and friends. Fenney and his friends had GPS trackers, and B.C. was concerned that they might put a tracker on her vehicle.

Fenney told B.C. that he was part of a gang. B.C. met several of Fenney's associates and they scared her because she knew "the kind of stuff that they did. They were just scary." 5 VRP (Jan. 31, 2018) at 700. B.C. was worried about her safety from other gang members that Fenney was associated with.

B.C. did not report Fenney to law enforcement because she worried about her safety. B.C. also testified that she did not report Fenney to law enforcement because she was brainwashed. B.C. thought she was in love with Fenney and often thought that it was her fault that she was being

beaten up. Fenney broke her down to the point where she felt she could not survive without having him there because he made her feel so stupid and dependent on him.

B.C. also testified about specific incidents underlying the charges.

a.      March 2016 Incident

B.C. and Fenney's relationship was non-violent until about March 2016, when Fenney became abusive. Fenney and B.C. had planned a road trip to Las Vegas, Nevada or California for Easter weekend. They rented a car and Fenney bought a Polo outfit. But after paying for the rental car and Fenney's outfit, they did not have enough money for the trip. Fenney became upset. Fenney had spent all of the money, but he blamed B.C. for not going on more prostitution calls. Fenney was agitated, and B.C. decided to leave. As B.C. tried to leave, Fenney snatched her by the coat, threw her against the car, and told her that she was not going anywhere. Fenney's mother pulled up to the house, and Fenney told B.C. to be thankful because otherwise he would have killed her.

Because they still had the rental car, Fenney decided they would go to a friend's house in Bremerton. After leaving the friend's house, the first "big assault" occurred. 5 VRP (Jan. 31, 2018) at 684. B.C. went on a prostitution call, and Fenney went to the call with her. B.C. got in the car afterwards, and Fenney was very agitated. B.C. started driving and Fenney began punching her while she was driving. Fenney had a firearm and hit B.C. with the gun.

Fenney told B.C. to drive to a park while the firearm was in his hand. At the park, Fenney ordered B.C. to get out of the car. Fenney held the firearm at the back of B.C.'s head while Fenney walked behind her. Fenney finally told B.C. to turn around, pointed the gun right at her, and said he would kill her. Fenney then turned around and told B.C. to walk back to the car.

Back at the car, Fenney did not want to go back to his mother's house because B.C. and Fenney were on methamphetamine, and he did not want his mother to know. They drove to a hotel. B.C. went inside to get a room, and the lady who worked at the hotel asked if B.C. was okay because B.C. had marks on her face. B.C. said the marks were from a bar fight. After checking in, B.C. contacted her friend and Fenney's mother because she was scared to be alone with Fenney, but they did not respond.

On the way to the room, Fenney, who still had the firearm in his hand, started punching B.C. on her face and arms. When they got to the room, Fenney told B.C. to take off all of her clothes. After B.C. took off her clothes, he threw her on the bed and began punching her again on her ribs, legs, head, and face. Fenney then raped B.C. anally while B.C. was screaming and trying to get him off her. Fenney and B.C. both fell asleep afterwards. B.C. did not leave Fenney after this even though she had a chance to do so because she was scared. From that point on, Fenney beat B.C. daily.

At the end of March, B.C. and Fenney moved out of Fenney's mother's house and into a house on Silver Street.

b.     April 2016 Incident

On April 9, B.C. and Fenney did not have any money, and B.C. knew that Fenney would get angry if she did not go on a prostitution call. B.C. went to a motel for a call, but she did not tell Fenney where she was. While at the call, Fenney was "blowing B.C.'s phone up" with phone calls and texts. 6 VRP (Feb. 1, 2018) at 731. A friend dropped Fenney off at the motel. Fenney told B.C. to get in the car and drive to the house. Fenney hit and screamed at B.C. as she drove, and he pointed his gun at B.C.

14

When they got back to the house, Fenney walked her upstairs to their bedroom with his gun to B.C.'s back. When they got to the bedroom, Fenney told her to take her clothes off and lie down on the bed on her stomach. Fenney's gun was still in his hand. Fenney took his belt off and whipped her about a hundred times from her neck to her ankles. After this, B.C. could not even sit down because of the welts on her body.

Fenney then pulled out a knife and held it to her armpit. Fenney told B.C. that "the fastest way you can bleed out is if you are cut on your armpit." 6 VRP (Feb. 1, 2018) at 735. Fenney threatened to cut her, and B.C. believed him. Then, Fenney put the knife inside her vagina and said, "You stupid b[****]. Why didn't you make—do you make me do this, and why are you making me do this?" 6 VRP (Feb. 1, 2018) at 735. While B.C. was sitting on the bed, Fenney put his gun inside of B.C.'s mouth and told her to stand up and stand in the bathroom doorway while he kept blaming her. Then Fenney fell asleep while B.C. had to remain standing naked. When Fenney woke up, he told B.C. to sit down.

c.　　　May 2016 Incident

In May, Fenney and a friend left the house, leaving B.C. and the friend's girlfriend, Afton Von Arb, together in the house. Although Fenney did not allow B.C. to talk to anyone, she and Von Arb made small talk. The next day, the friend came over again and was talking to Fenney. B.C. said, "Oh, me and [Von Arb] were just talking about that." 6 VRP (Feb. 1, 2018) at 746. Fenney punched B.C., and B.C. lost consciousness. Fenney then demanded to know what else B.C. and Von Arb had talked about. Fenney made his friend have Von Arb come to the house. Fenney, while holding a machete and a firearm, said that if Von Arb said anything else that B.C. did not say, he would kill B.C.

When Von Arb arrived, Fenney made Von Arb and B.C. sit back to back and tell him what they had talked about. Fenney held a gun to B.C.'s head and said to Von Arb, "I know there is more, b[****]. You better come up with something now." 6 VRP (Feb. 1, 2018) at 749. Fenney also held the machete to B.C.'s arm. Von Arb said they had not talked about anything else. Fenney took a blowtorch, made B.C. hold up her foot, and torched the bottom of B.C.'s foot. He moved the torch up to her ankle and with the machete he pushed down on her ankle. The machete cut B.C.'s ankle open and Fenney started "freaking out," saying, "Get this b[****] to the bathroom. B[****], walk to the bathroom and put your leg in the bathtub." 6 VRP (Feb. 1, 2018) at 751. Fenney did not want B.C. to go to the hospital because he was worried about what B.C. would say as to how she got cut and burned. B.C. went to the doctor when the cut and burn looked infected. B.C. told the doctor that she fell into a bonfire.

  d.  May/June 2016 Incident

Around May or June, Fenney was mad with B.C. B.C. was lying on the bed with her back against the headboard. Fenney began hitting B.C. with a wooden pole from their closet that Fenney had written "Beat that a[**] stick" on it. 6 VRP (Feb. 1, 2018) at 744. Fenney had a gun in one hand and the pole in the other. Fenney then made B.C. go into another room and sit on the floor, and he began hitting her again. Fenney then stated, "B[****], sit here and don't move a muscle and don't even breathe unless I tell you to breathe." 6 VRP (Feb. 1, 2018) at 743. B.C. sat in the room for about an hour. After that incident, B.C. could barely walk and her knuckles and fingers were swollen. At the time of the trial, B.C.'s legs were still indented from the stick.

e.      July/August 2016 Incident

K.W. and her boyfriend, Ernest Kornegay, moved into the Silver Street house around July. K.W. would tell B.C. to leave and would give B.C. food when she did not have food. Before K.W. moved in, Fenney did not let B.C. talk to K.W. because "[K.W.] wasn't a ho and wasn't on drugs like the other girls." 6 VRP (Feb. 1, 2018) at 727.

In July or August, Fenney, B.C., and another couple took a road trip to California. During the entire trip, Fenney blamed everything on B.C. Fenney punched B.C. while he drove, and at rest stops, he forced her to give him oral sex. After Fenney's mother left him messages that B.C.'s mother had called and was threatening to report to the police that Fenney kidnapped B.C. if Fenney did not get B.C. back to Washington, Fenney started hitting B.C. repeatedly, causing B.C.'s nose to bleed. Fenney also hit B.C. in the back, and when they got back to Washington, B.C. went to the hospital because she was in so much pain and received treatment for a broken rib.

f.      August 2016 Incident

In August, Fenney began hitting B.C. with his belt over and over again. The belt buckle knocked B.C. out. The assault left B.C. with bruises on her body.

Also in August, B.C. saw Fenney assault K.W. Fenney, B.C., K.W., and Kornegay were in the car. Fenney demanded everyone's phone. K.W. said she did not have a phone. Fenney pointed his gun at K.W.'s head and said, "I will kill this b[****]." 6 VRP (Feb. 1, 2018) at 825. K.W. gave Fenney her phone.

g.      September 2016 Incident

In September, B.C. was having a hard time and wanted to be by herself. She drove to West Bremerton for a prostitution call. Fenney called her, and B.C. told him that she needed time by

herself. Fenney began questioning whether B.C. was trying to leave. Fenney met B.C. in a parking lot. Fenney said, "Oh, b[****], you think you're going to f*****g leave?" 6 VRP (Feb. 1, 2018) at 786. Fenney demanded B.C.'s phone and told her to drive to the house. They went into the bedroom and Fenney started beating B.C. B.C. fell down, and while B.C. was on the floor, Fenney began punching her and then dumped two bottles of urine over B.C.'s head. Fenney, while pointing a firearm at her, told B.C. to go sit in the garage. In the garage, Fenney had his firearm in his hand and told B.C. not to move. Fenney left B.C. sitting in the garage while he met with some friends who came over to the house. Their bedroom was right above the garage, and B.C. could hear Fenney having sex with someone in the bedroom. After Fenney was done having sex, he came to the garage, and told B.C. that she could go upstairs.

        h.        October 2016 Incident

In early October, B.C. had been texting with a man named Eric. When B.C. came back to the house after staying with her friend, Fenney demanded that she give him her phone. B.C. handed her phone to Fenney. B.C. was not nervous at that point. Fenney had his firearm with him, but B.C. did not remember exactly where it was.

Fenney saw the texts with Eric and began punching and smacking B.C. with a machete. Fenney also put a hot methamphetamine pipe on B.C.'s face. Fenney then made B.C. call Eric and set up a meeting at a store. After she hung up the phone, Fenney sprayed her with pepper spray. Fenney still had the firearm with him. Fenney drove B.C. to meet Eric at the store and kept hitting B.C. on the side of her face during the drive. When they got to the meeting spot, they did not see Eric. Fenney took a bottle of Rain-X and squirted it all over B.C.'s head. The Rain-X

burned.  Fenney then pointed his gun at B.C. telling her that she "was trying to save [her] boyfriend's a[**]."  6 VRP (Feb. 1, 2018) at 803.

Fenney and B.C. went back to the house.  When they got back to the house, Fenney, who had a firearm in his hand, told B.C. to go to their bedroom.  Fenney picked up his machete and repeatedly smacked B.C. with it.  Fenney told B.C. to take her clothes off.  B.C. was not taking her clothes off fast enough, so Fenney began ripping them off.  Fenney told B.C. to sit down on an ottoman.  Fenney put a pen torch inside B.C.'s vagina and burned her legs.  While Fenney was burning B.C., he was saying, "You know that I am going to kill you, b[****]."  6 VRP (Feb. 1, 2018) at 840.  B.C. believed that Fenney was going to kill her.

After Fenney was done burning B.C., he told her to get dressed.  Fenney then told B.C. to sit down again, got the machete, and struck her knee very hard with the machete.  Fenney told B.C. not to look at her leg, and she did not.  Fenney wrapped up B.C.'s leg with shirts and towels, and told B.C. she needed to go to the hospital.  B.C. chose not to go to the hospital and fell asleep.

When B.C. woke up, B.C.'s leg had bled through all of the layers shirts and towels, and there was a puddle of blood on the floor.  Kornegay and K.W. took B.C. to the hospital.  B.C. told the hospital that she had been in a go-cart accident.  At the hospital, B.C. learned her knee had been cut all the way down to the bone.  B.C. needed surgery on her knee, but she left because she was scared and alone in the hospital.  B.C. went back to the Silver Street house.

Back at the house, while B.C. was lying in bed, not able to walk, Fenney began getting mad again.  Fenney held a gun to B.C.'s head.  The gun went off, but the bullet missed B.C. and ended up in the wall.

2.      K.W.'s testimony

a.      Testimony regarding B.C.

K.W. was dating Kornegay in 2016.  In July or August of 2016, K.W. and Kornegay moved into the Silver Street house.  Fenney and B.C. also lived in the house.

B.C. was engaged in prostitution, and B.C. would give the money she earned to Fenney, who was B.C.'s pimp.  Fenney placed restrictions on B.C.  B.C. could not leave unless she asked and had to sit on the bed in their room.  B.C. was only allowed to talk to K.W.  B.C. would get in trouble if she looked at another man.

Fenney used to hit B.C. and call her names.  K.W. testified, "I would call it torturing her." 9 VRP (Feb. 7, 2018) at 1278.  K.W. saw injuries on B.C. B.C. had a black eye, bruises everywhere, cuts, and burns.  K.W. saw Fenney burn B.C. with a blowtorch and a methamphetamine pipe.  B.C. also showed K.W. her burned vagina.  B.C. was injured so badly, she could not even use the bathroom.  One time, Fenney forced B.C. to kneel and lean over naked, while he hit her with a belt.  Another time, Fenney and B.C. were arguing and Fenney hit B.C. causing her glasses to break.  Fenney then poured urine on B.C. and made her stand outside in the hallway and then in the garage.  B.C. was in the garage for a couple of hours.  Another time, Fenney and B.C. came out of their room, blood was pouring from B.C.'s kneecap.  Fenney told K.W. to take B.C. to the hospital.  Fenney told B.C. to say that she had gotten into a go-kart accident.

b.      Testimony regarding violence against K.W.

One time, Fenney demanded everyone's phone when they were in a car.  Fenney had a firearm.  K.W. refused to give Fenney her phone.  Kornegay told K.W. to give Fenney the phone.

After K.W. handed Fenney the phone and tried to get out of the car, Fenney held a gun to her temple. Fenney said he would kill her, and K.W. believed him.

There was another incident in October 2016 at the house. Kornegay had committed a robbery, and Fenney was angry. Fenney told K.W. to not leave the house until he talked to Kornegay. K.W. left the house because she had an orientation at work that day. Fenney came to her work place and said, "Didn't I tell you not to leave?" 9 VRP (Feb. 7, 2018) at 1298. After the orientation, K.W. went to stay with one of Kornegay's friends. When K.W. eventually went back to the Silver Street house, Fenney was the only person there. Fenney grabbed K.W. from behind and dragged her into his bedroom. Fenney's firearm was on the bed. Fenney said that he was going to kill K.W. Fenney told K.W. to get on the bed and take her clothes off. Fenney took his own clothes off and made K.W. have sex with him. After the assault, K.W. grabbed her clothes and left the house.

#### c.      Law enforcement involvement

In mid-November 2016, Kornegay and K.W. drove to the store where K.W. worked. Kornegay went to the restroom while K.W. began to work. The police came inside the store and handcuffed Kornegay. When Kornegay got arrested, he told K.W. to "[t]ell them everything." 9 VRP (Feb. 7, 2018) at 1334. K.W. understood that to mean everything that went on in the house.

### 3.      Expert Witness Testimony

Maurice Washington, a detective with the Seattle Police Department and a task force officer with the FBI, testified, without objection, that prostitution is a subculture and has its own hierarchy. Victims become involved in the "game of prostitution" by being recruited by pimps. 4 VRP (Jan. 30, 2018) at 572. Ninety-nine percent of the women that work in the prostitution field

are controlled by a pimp. The longer the victim stays a prostitute the harder it is for them to get out of it, and the damage done to them physically and psychologically becomes permanent.

In the prostitution subculture, the victims "are the pawns and pieces of the game, and the idea is to sell them a dream and utilize them in the game." 4 VRP (Jan. 30, 2018) at 575. There are some baseline rules and some pimp-specific rules. Detective Washington testified that

> [s]ome of the rules are you are not allowed to talk to other pimps, so a lot of times that comes up as no African American males because, you know, there is this stigma that a lot of African American males are related to or of that sub-culture versus other races that you may see. So there might be a rule: Don't talk to any African American males, meaning you can't have that type of customer.

4 VRP (Jan. 30, 2018) at 576. Other rules involve whom prostitutes can talk to, when they can call their families, and how to set quotas and prices for dates.

Pimps look to victimize a person who is vulnerable: "Pimps are master manipulators, and their focus and their drive is to be able to look and feel out those vulnerabilities and use them to their advantage to get the person to work for them." 4 VRP (Jan. 30, 2018) at 577. The victims become more and more dependent on the pimps. Some pimps begin by first entering into a romantic relationship with a girl and take on the role of a boyfriend. The pimp can find out the victim's vulnerabilities and exploit them. Pimps manipulate prostitutes in different ways: "You see everything from the finesse pimp to the gorilla pimp." 4 VRP (Jan. 30, 2018) at 580. The gorilla pimp uses physical violence and force to get the victim to do what they want her to do. Pimps display power by coercion, threats, physical abuse, psychological abuse, purposeful manipulations, isolation, dependence on the pimp, economic, or narcotic.

Most victims will not tell anyone that they are a victim. Rather, they will say they are doing this because they want to. Washington explained:

Basically it's modern day slavery, and, you know, on the base of it, no one would want to do that. No one would want to give up their freedoms so that this other person can make money from it.

But the way that this game is sold to them, they actually believe that they are doing this, and they are helping out this dysfunctional family from their own free will.

4 VRP (Jan. 30, 2018) at 583-84. Victims often do not report abuse because it is hard for them to step out of the role. Victims feel some type of loyalty and allegiance to the pimp, as well as fear.

Detective Washington testified on direct and cross examination that he had not heard the particular facts of the current case at all.

4.    Text Messages Evidence

In October 2016, Fenney and Kornegay exchanged text messages discussing a robbery that Kornegay had committed. Fenney wanted his share of the contents obtained in the robbery. The State had an exhibit documenting Fenney's text messages, including the following:

Until we talk or I see you or something your girl ain't leaving

    . . . .

And I have her [K.W.'s] phone so either we talk soon or I start something way different up in here . . . period

    . . . .

You thought wrong my n[****] now the boys s[***] it was talking about rounding up troops and coming here so yo girl done

    . . . .

at 830 every hour your b[****] losses a finger till you here

    . . . .

You have 29 minutes and your lady starts losing fingers

23

. . . .

I see any police I shoot her

. . . .

I'm going to your brothers house and I'm killing everybody in there

. . . .

You don't call I'm going inside [the store] and shooting your b[****].

CP at 790-91, 793, 800 (Exhibit 335).

The State sought to admit the text messages, arguing that K.W. was being held hostage by Fenney. The State also argued that the text messages corroborated aspects of K.W.'s and B.C.'s testimony. The trial court acknowledged and agreed with Fenney's argument that the nature of the statements by the defendant were prejudicial because they showed him to be controlling, hostile, and menacing. Further, the texts, along with B.C. and K.W.'s testimony about the type of violence Fenney was capable of inflicting, made the texts highly prejudicial to Fenney. However, the trial court ruled that the text messages were admissible.

The trial court asked that the State and defense craft a limiting instruction to properly focus the jury's attention on the text evidence. After the trial court heard argument regarding the limiting instruction, the trial court stated that the limiting instruction should confine the jury's use of the evidence to the defendant's state of mind. The trial court engaged in extensive discussions with both parties regarding how the evidence applied to each element of each charge. Throughout the discussions, the trial court recognized and weighed the prejudice from the text messages against their probative value. Ultimately, Fenney requested that there be no limiting instruction.

E.      VERDICT AND SENTENCING

The jury found Fenney guilty on all counts except attempted first degree murder. The jury also found that all the special allegations applied, except sexual motivation for first degree assault as charged in count 24.

At sentencing, the trial court found that the first degree rape as charged in count 23 and the first degree assault as charged in count 24 merged, and vacated the conviction for count 24. The trial court also found that first degree unlawful possession of a firearm as charged in count 31 was the same criminal conduct as first degree unlawful possession of a firearm charged in count 30 and vacated the conviction for count 31. The trial court imposed an exceptional sentence for the remaining convictions based on the jury's verdicts on the special allegations. The trial court ordered total confinement of 4,084 months. CP 727.

Fenney appeals.

## ANALYSIS

A.      EXPERT TESTIMONY

Fenney argues that the State's expert witness, Detective Washington, provided improper testimony. Specifically, Fenney contends that Detective Washington's, testimony was unfairly prejudicial because "it was not only profile testimony, but blatantly and overtly appealed to racial bias." Second Am. Br. of Appellant at 28. Fenney further contends that Detective Washington improperly gave an opinion on guilt. We disagree.

Expert testimony is admissible when the witness qualifies as an expert, the opinion is based on an explanatory theory generally recognized in the scientific community, and the testimony would help the trier of fact. *State v. Perez*, 137 Wn. App. 97, 108, 151 P.3d 249 (2007). ER 702

also permits admission of qualified expert testimony when scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue.

1.      Prostitution Subculture Profile Testimony

"'Profile testimony' identifies a person as a member of a group more likely to commit a crime." *State v. Crow*, 8 Wn. App. 2d 480, 495, 438 P.3d 541, *review denied*, 193 Wn.2d 1038 (2019). "With profile evidence, the State attempts in part to convict the accused on evidence beyond the individual circumstances of the case and on one or more traits the accused possesses in common with others who purportedly commit the same crime." *Id.*[6]

"Profile evidence cannot be used as substantive proof of guilt because of the risk that a defendant will be convicted not for what he did but for what others are doing." *Id.* at 496. "Washington follows the prevailing view that generally precludes profile testimony because of its relative lack of probative value when compared to the danger of its unfair prejudice." *Id.* at 497.

Fenney argues that the following statement by Detective Washington amounted to profile testimony because the testimony "invited the jury to see Fenney, a black man, was probably guilty of promoting prostitution and human trafficking based on behavioral characteristics of other known offenders: because black men were 'stigmatized' as being overrepresented in the pimp culture." Second Am. Br. of Appellant at 29-30.

Here, Detective Washington testified:

Some of the rules are you are not allowed to talk to other pimps, so a lot of times that comes up as no African American males because, you know, there is this

---

[6] Fenney asks us to create a rule that profile testimony is per se inadmissible. We decline to adopt such a rule.

> stigma that a lot of African American males are related to or of that sub-culture versus other races that you may see. So there might be a rule: Don't talk to any African American males, meaning you can't have that type of customer.

4 VRP (Jan. 30, 2018) at 576. Detective Washington's testimony goes to the aspects of the prostitution subculture, including the fact that there may be rules relating to victims. Detective Washington noted that there might be a rule about who one can talk to based on stigma. Detective Washington did not testify that the rule actually exists or to truth of any such rule or rules. Detective Washington also did not testify that African American males are more likely to traffic humans or promote prostitution. *See Crow,* Wn. App. 2d at 495. And Detective Washington did not testify that Fenney was a member of a group more likely to commit a crime. Thus, Detective Washington did not present evidence that Fenney was a member of a group more likely to commit a crime, and his comment was not profile testimony.[7]

> 2. "Gorilla Pimp" vs. "Finesse Pimp"

Fenney argues that Detective Washington's use of the phrase "gorilla pimp" was racially charged. Fenney relies on *State v. Monday*, 171 Wn.2d 667, 257 P.3d 551 (2011), to argue that Detective Washington's testimony perpetuated implicit and overt racial bias.

---

[7] Even if Detective Washington's testimony regarding prostitution subculture was improper, any error was harmless. An evidentiary error is harmless if "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *State v. Gunderson*, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014) (internal quotation marks omitted) (quoting *State v. Gresham*, 173 Wn.2d 405, 433, 269 P.3d 207 (2012)). Here, the State did not emphasize the expert testimony and did not rely on the testimony during closing argument. Furthermore, the State presented overwhelming evidence from the victims establishing Fenney's crimes. Therefore, there is no reasonable probability that the testimony regarding prostitution subculture materially affected the verdict. Accordingly, even if admitting the testimony was in error, it was harmless.

"'[T]heories and arguments based upon racial, ethnic and most other stereotypes are antithetical to and impermissible in a fair and impartial trial.'" *Monday*, 171 Wn.2d at 678 (quoting *State v. Dhaliwal*, 150 Wn.2d 559, 583, 79 P.3d 432 (2003) (Chambers, J. concurring)). "[A] careful word here and there can trigger racial bias." *Id*.

In *Monday*, the defendant argued that the prosecutor injected racial prejudice into the trial proceedings by asserting that black witnesses are unreliable and using derogatory language toward a black witness. *Id*. at 676. The court determined that the State intentionally and improperly imputed an antisnitch code to black persons only. *Id.* at 678. Further, this functioned as an attempt to discount several witnesses' testimony on the basis of race alone. *Id*. The State also began referring to the police as "po-leese." *Id.* at 679. The court determined that "the only reason to use the word 'po-leese' was to subtly, and likely deliberately, call to the jury's attention that the witness was African American and to emphasize the prosecutor's contention that 'black folk don't testify against black folk.'" *Id*. The court held that it was improper for the prosecutor to cast doubt on the credibility of the witnesses based on their race, thus the court could not say beyond a reasonable doubt that the impropriety did not affect the jury's verdict. *Id.* at 681.

Fenney's reliance on *Monday* is misplaced. *Monday* addressed prosecutorial misconduct based on the prosecutor's intentional injection of racial prejudice into the presentation of evidence and closing argument. Here, Fenney's challenge is not based on prosecutorial misconduct or the prosecutor's intentional injection of racial prejudice into the presentation of evidence. In fact, Fenney's challenge is not even based on the prosecutor's conduct. Instead, Fenney only argues the expert's testimony implied a racial bias. The State did not rely on this testimony in its closing argument. Therefore, *Monday* is inapplicable.

Also, the State presented Detective Washington's testimony of "gorilla pimps" and "finesse pimps" to discuss the various ways that pimps manipulate prostitutes into working for them. Unlike in *Monday*, the State did not present these terms in order to discount Fenney's arguments or any other evidence in his favor based on his race. *See* 171 Wn.2d at 678. And the State did not present the terms "gorilla pimp" as a theory or argument based upon racial, ethnic and other stereotypes. *See id.*

Fenney provides no evidence of racial connotations associated with the terms "gorilla pimp" and "finesse pimp." And there is no evidence that Detective Washington attributed either category of pimps to Fenney. Further, Detective Washington clearly testified that he did not have knowledge of the facts of Fenney's case. Therefore, Fenney's argument lacks merit.[8]

3.      Opinion on Guilt

Fenney argues that Detective Washington invaded the province of the jury when he opined that prostitution was "'modern day slavery.'" Second Am. Br. of Appellant at 30 (quoting 4 VRP (Jan. 30, 2018) at 583). Fenney contends that Detective Washington's opinion "was an almost explicit opinion on guilt." Second Am. Br. of Appellant at 30.

---

[8] Even if Detective Washington's testimony regarding "gorilla pimps" was improper, any error was harmless. An evidentiary error is harmless if "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *Gunderson*, 181 Wn.2d at 926 (internal quotation marks omitted) (quoting *Gresham*, 173 Wn.2d at 433). Here, the testimony about "gorilla pimps" was a passing comment in expert testimony that familiarized the jury with prostitution culture generally, rather than Fenney's case specifically. The term was not attributed to Fenney specifically. And the State presented extremely detailed testimony from B.C. and K.W. about Fenney's actions. There is not a reasonable probability that exclusion of the "gorilla pimp" testimony would have changed the outcome of the trial. Accordingly, even if admitting the testimony was error, it was harmless.

Neither a lay nor an expert witness "'may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference.'" *State v. King*, 167 Wn.2d 324, 331, 219 P.3d 642 (2009) (quoting *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987)). "A law enforcement officer's opinion testimony may be especially prejudicial because the 'officer's testimony often carries a special aura of reliability.'" *Id.* (quoting *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007)).

Here, Fenney contends that Detective Washington's comment was an opinion on guilt. But Detective Washington did not opine that Fenney was guilty. In fact, Detective Washington testified that he had not heard the particular facts of the current case at all. Detective Washington merely testified as to the pimp/prostitute relationship.

Further, Fenney asks us to speculate that even if B.C. testified she became a prostitute because she wanted to, the expert testimony was that she was trafficked and a victim. There is no basis in the record to support any such speculation. B.C. did not testify that she became a prostitute because she wanted to. Rather, B.C. testified that she became a prostitute upon Fenney's suggestion. The idea was to save up money for themselves, but Fenney ended up keeping the money. And B.C. testified that her quitting prostitution was not an option with Fenney. Fenney would abuse B.C. if she did not make enough money, if she spoke to anyone he did not allow her to speak to, or if Fenney thought she was trying to leave.

Because Detective Washington did not give an opinion as to Fenney's guilt, and Fenney asks us to merely speculate about the effect of Detective Washington's testimony, Fenney's argument fails.

B.     INEFFECTIVE ASSISTANCE OF COUNSEL

Fenney argues that he received ineffective assistance of counsel because his trial counsel failed to object to the racially charged testimony.  We disagree.

We review ineffective assistance of counsel claims de novo.  *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018).  In reviewing ineffective assistance of counsel claims, we begin with a strong presumption of counsel's effectiveness.  *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).  A defendant claiming ineffective assistance of counsel has the burden to establish that (1) counsel's performance was deficient and (2) the performance prejudiced the defendant's case.  *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014).  Failure to establish either prong is fatal to an ineffective assistance of counsel claim.  *Id.* If the defendant bases his ineffective assistance of counsel claim on defense counsel's failure to object, the defendant must show that the objection would have succeeded.  *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

The defendant must show in the record the absence of a legitimate strategic or tactical reason supporting the challenged conduct of omission by counsel.  *Grier*, 171 Wn.2d at 33.  We will not consider matters outside the record on direct appeal.  *State v. Linville*, 191 Wn.2d 513, 525, 423 P.3d 842 (2018).  Thus, "'[i]f a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition, which may be filed [and heard] concurrently with the direct appeal.'" *Linville*, 191 Wn.2d at 525 (quoting *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995)).

Here, there is no evidence in the record about counsel's strategic or tactical decisions in the trial court regarding trial counsel's failure to object on the basis of alleged racially charged testimony. Thus, review of this issue would require considering matters outside the record. We do not consider matters outside the record on direct appeal. *See id*. Therefore, we do not reach the merits of Fenney's ineffective assistance of counsel challenge.

## C.   MOTION TO SEVER

Fenney argues that the trial court erred by denying his motion to sever count 42 for the rape of K.W. We disagree.

Under CrR 4.3(a)(1), offenses of the same or similar character may be joined even if they are not part of a single scheme or plan. "'[A] motion to sever under CrR 4.4(b) addresses the issue of prejudice to the defendant not withstanding proper joinder.'" *State v. Moses*, 193 Wn. App. 341, 360, 372 P.3d 147, *review denied*, 186 Wn.2d 1007 (2016) (quoting *State v. Gatalski*, 40 Wn. App. 601, 606, 699 P.2d 804 (1985)). CrR 4.4(b) requires severance if "the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." The defendant has the burden of demonstrating that the manifest prejudice of a single trial on the offenses outweighs the concern for judicial economy. *State v. Nguyen*, 10 Wn. App. 2d 797, 815, 450 P.3d 630 (2019), *review denied*, 195 Wn.2d 1012 (2020).

We examine several factors to determine if a denial of a motion to sever is unduly prejudicial and outweighs judicial economy: "'(1) the strength of the State's evidence on each count; (2) the clarity of defenses to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.'" *Id.* (quoting *State v. Russell*, 125 Wn.2d 24, 62-63, 882 P.2d 747 (1994)). We review a

32

refusal to sever for manifest abuse of discretion. *Id.* at 814. The defendant must point to specific prejudice to support a finding that refusal to sever was an abuse of discretion. *State v. Alsup*, 75 Wn. App. 128, 131, 876 P.2d 935 (1994).

1.    Strength of the State's Evidence

We first look to the strength of the State's evidence for each count to ascertain the potential for prejudice. *Nguyen*, 10 Wn. App. 2d at 815 Here, Fenney concedes that the strength of the evidence on the charged offenses involving B.C. and K.W., with the exception of K.W.'s rape allegation, was strong because the State had medical records and eye witness accounts. As for the charge that Fenney raped K.W., the evidence at trial showed that Fenney told K.W. to not leave the house until he talked to Kornegay. K.W. left the house because she had an orientation at work that day. Fenney came to her work place and said, "Didn't I tell you not to leave?" 9 VRP (Feb. 7, 2018) at 1298. Text messages between Fenney and Kornegay confirmed that Fenney threatened to harm K.W. K.W. went to one of Kornegay's friend's house after her work orientation. K.W. eventually went back to the Silver Street house because she was tired of wearing the same clothes every day. When K.W. was in the house, Fenney grabbed K.W. from behind and dragged her into his bedroom. Fenney told K.W. to get on the bed and take her clothes off. Fenney took his own clothes off and made K.W. have sex with him. There is substantial evidence supporting the rape charge involving K.W. Thus, this factor does not support a determination of manifest prejudice outweighing judicial economy.

2.    Defenses

With regard to the clarity of the defenses for each count, mutually antagonistic defenses may be sufficient to support a motion to sever. *State v. Sublett*, 176 Wn.2d 58, 69, 292 P.3d 715

(2012). "The conflict must be so prejudicial that the two defenses are irreconcilable, such that the jury will unjustifiably infer that the conflict alone demonstrates that both defendants are guilty." *Id*. Fenney's defense was a general denial of all the charges. Thus, this factor does not support a determination of prejudice outweighing judicial economy.

       3.      Limiting Instruction

With regard to the court's instruction to the jury as to the limited purpose for which it was to consider the evidence of each crime, Fenney argues that the trial court "inferred a criminal disposition and linked the charge of human trafficking of B.C. with the charged assault and rape of K.W." Second Am. Br. of Appellant at 35. Fenney contends that he was not charged with human trafficking of K.W, and "[t]he record at the time of the ruling and throughout the trial was that K.W. was neither a prostitute nor a drug user, nor was she a subject of human trafficking." Second Am. Br. of Appellant at 35-36. But this argument is not relevant to the third factor, which relates to limiting instructions.

Moreover, the trial court instructed the jury that a separate crime is charged in each count, it must decide each count separately, and its verdict on one count should not control its verdict on any other count. Juries are presumed to follow the court's instructions unless there is evidence to the contrary. *State v. Lamar*, 180 Wn.2d 576, 586, 327 P.3d 46 (2014). Fenney has presented no evidence that the jury failed to follow the trial court's instruction. Thus, Fenney has not shown that this factor weighs in favor of a determination of manifest prejudice outweighing judicial economy.

4.      Cross-Admissibility

Lastly, with regard to the admissibility of the evidence of the other crimes even if they had been tried separately or never charged or joined, Fenney argues that "[t]he allegation of rape by K.W. had nothing to do with human trafficking and the evidence was not cross-admissible under ER 404(b) exceptions." Second Am. Br. of Appellant at 37.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b). Such propensity evidence is not prohibited because it is irrelevant; rather, "'it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.'" *State v. Kennealy*, 151 Wn. App. 861, 886, 214 P.3d 200 (2009) (internal quotation marks omitted) (quoting *State v. Herzog*, 73 Wn. App. 34, 49, 867 P.2d 648 (1994)), *review denied*, 168 Wn.2d 1012 (2010).

The trial court must presume that evidence of prior bad acts are inadmissible and decide in favor of the accused when the case is close. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003); *State v. Wilson*, 144 Wn. App. 166, 177, 181 P.3d 887 (2008). Evidence of other wrongs or acts "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). Evidence of a common scheme or plan may be used to show whether the charged incidents actually occurred or whether the victim was fabricating or mistaken. *State v. Lough*, 125 Wn.2d 847, 861-62, 889 P.2d 487 (1995).

Here, the evidence shows that Fenney raped K.W. because she left the house after Fenney told her not to leave. Similarly, Fenney would attack B.C. anytime B.C. tried to leave, or Fenney

perceived B.C. as trying to leave. While there is no evidence that K.W. was a trafficking victim, Fenney's actions towards K.W. shows how Fenney went about maintaining his control over others and dealt with people who did not comply with his demands and would try to leave without his permission. Thus, evidence of the rape of K.W. would be cross-admissible as a common scheme or plan. Therefore, Fenney has not shown that this factor weighs in favor of a determination of manifest prejudice outweighing judicial economy.

Because Fenney has not met his burden of demonstrating that the manifest prejudice of a single trial on the offenses outweighed the concern for judicial economy, the trial court did not abuse its discretion in denying the motion to sever.

D.    APPEARANCE OF FAIRNESS VIOLATED BY ADMISSION OF TEXT MESSAGES

Fenney argues that the trial court violated the appearance of fairness when it admitted the text messages between Fenney and Kornegay. Specifically, Fenney argues that the trial court improperly acted as an advocate when it provided its own reasons for admitting the text messages under ER 404(b). Fenney also argues that the trial court's reasons for admitting the text messages demonstrate a violation of the appearance of fairness because those reasons were improperly based on character evidence.

Both the state and federal constitutions guarantee a criminal defendant the right to be tried by an impartial court. *State v. Solis-Diaz*, 187 Wn.2d 535, 539, 387 P.3d 703 (2017). "Pursuant to the appearance of fairness doctrine, a judicial proceeding is valid if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing." *Id.* at 540. "The party asserting a violation of the appearance of fairness must show a judge's actual or potential bias." *Id.*

"A trial court should not enter into the 'fray of combat' or assume the role of counsel." *State v. Ra*, 144 Wn. App. 688, 705, 175 P.3d 609 (quoting *Egede-Nissen v. Crystal Mountain, Inc.*, 93 Wn.2d 127, 141, 606 P.2d 1214 (1980)), *review denied*, 164 Wn.2d 1016 (2008). In *Ra*, this court determined "the trial court's proposal of theories for the State to use in admitting improper ER 404(b) evidence" was inappropriate. *Id*. at 705.

Fenney argues that the trial court made arguments on behalf of the State for admitting the evidence. However, the comments that Fenney relies on were not the bases for the trial court's ruling in admitting the text messages; instead, they were made in the context of the trial court's attempt to craft a limiting instruction *after* the trial court already determined that the text messages were admissible. The trial court's comments were not arguments that were being made on behalf of the State. Instead, the trial court had already agreed with the State that the text messages were relevant to corroborating K.W.'s and B.C.'s statements. The trial court's discussion regarding admissibility of the text messages was more general, whereas the discussion regarding the limiting instruction, in which the trial court parsed the relevance of the evidence to each element of each charge, included the challenged statements.

Because the trial court was going through a detailed analysis of the relevance to each charge and element in order to attempt to craft a limiting instruction, meant to reduce the prejudice to the defendant, a reasonably prudent, disinterested observer would not interpret the trial court's extensive discussion regarding a limiting instruction as evidence of bias. And the trial court was not assuming the role of counsel, but was engaged in an active discussion with both counsel in order to clarify a limiting instruction. Furthermore, the trial court did not propose reasons for

admissions of the evidence but was working to understand and balance both parties' positions within the context of the evidence and testimony that had already been presented.

When viewed as whole, the trial court's decision should not be considered evidence of bias. Instead, the trial court was actively and thoroughly trying to balance the State's arguments regarding relevance with the valid concerns regarding prejudice to the defendant. Fenney fails to meet his burden to show the trial court's potential bias.

Fenney also argues that the following statement by trial court was inappropriate:

"It's—I agree that the nature of the statements made by the defendant are prejudicial to him in that they show him to be controlling, hostile, menacing, and that, coupled with [B.C.]'s testimony and [K.W.]'s testimony about the type of violence that he is capable of inflicting, those are highly prejudicial to the defendant."

Second Am. Br. of Appellant at 41 (quoting 10 VRP (Feb. 8, 2018) at 1390). But based on the context of the trial court's statement, a reasonably prudent, disinterested observer would not interpret the trial court's statement as evidence of bias. The trial court was simply acknowledging, and agreeing with, Fenney's argument that the text messages were "highly prejudicial because it involves alleged acts of violence or threats by the defendant." 10 VRP (Feb. 8, 2018) at 1390. The trial court's acknowledgment of Fenney's own argument is not evidence of bias against Fenney, nor is it improper. Therefore, Fenney has not shown the trial court's actual or potential bias based on this comment.

Finally, Fenney argues that there was further evidence of bias because the reasons the trial court made on behalf of the State were improper. But, as noted above, none of the trial court's comments are evidence that the trial court was acting as an advocate for the State or evidence of

the trial court's potential bias. Therefore, this argument is unpersuasive. We reject Fenney's argument that the trial court's comments violated the appearance of fairness doctrine.

E.    GANG AFFILIATION EVIDENCE

Fenney argues that the trial court erred by admitting evidence of his gang affiliation because there was no nexus between the alleged crimes and gang membership. Fenney contends that "[b]eliefs about gang affiliation were irrelevant to the alleged crime of felony harassment or to explain [B.C.'s] reasons for not going to the police." Second Am. Br. of Appellant at 45.

Evidence of criminal street gang affiliation is not admissible in a criminal trial when it merely reflects a person's beliefs or associations. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009), *review denied*, 168 Wn.2d 1004 (2010). There must be a nexus between the crime and gang membership. *See State v. Campbell*, 78 Wn. App. 813, 822, 901 P.2d 1050, *review denied*, 128 Wn.2d 1004 (1995).

Admission of gang affiliation evidence is measured under the standards of ER 404(b). *Scott*, 151 Wn. App. at 526. "Evidence of other bad acts can be admitted under ER 404(b) when a trial court identifies a significant reason for admitting the evidence and determines that the relevance of the evidence outweighs any prejudicial impact." *Id*. at 527. We review a trial court's decision to admit ER 404(b) evidence for abuse of discretion. *Id*. "Discretion is abused when it is exercised on untenable grounds or for untenable reasons." *Id*. Courts regularly admit gang affiliation evidence to establish the motive for a crime or to show that defendants were acting in concert when there is a connection between the defendant's gang affiliation and the charged offense. *Id*.

Here, the trial court only admitted evidence that B.C. knew about Fenney's gang affiliation to show her state of mind and fear. This evidence was probative in order to show the jury why B.C. remained with Fenney and did not report the crimes to the police—she was concerned about retaliation, not only from Fenney but from other members of the gang. While the trial court recognized the prejudicial impact of the testimony, the trial court limited the impact by not allowing testimony that Fenney was in fact part of a gang.

Because the evidence of B.C.'s knowledge of Fenney's gang affiliation was connected to the charged offense and the trial court limited the prejudicial impact by prohibiting any testimony that Fenney was in fact a part of a gang, the trial court did not admit the evidence based on untenable grounds or for untenable reasons. *See Scott*, 151 Wn. App. at 527. Thus, the trial court did not abuse its discretion by admitting the gang affiliation evidence.

F.      FAIR TRIAL

Fenney argues that he was denied a fair trial. Fenney contends that "[t]he trial court entered the fray of combat by assuming the role of the prosecutor in expanding the prosecutor's theories, admitting evidence to specifically demonstrate propensity for misconduct, allowing irrelevant evidence of purported gang membership, and denying a severance motion." Second Am. Br. of Appellant at 23. We disagree.

"Criminal defendants have a due process right to a fair trial by an impartial judge. WASH. CONST. art. I sec. 22; U.S. CONST. amends. V, VI, XIV. Impartial means the absence of actual or apparent bias." *In re Swenson*, 158 Wn. App. 812, 818, 244 P.3d 959 (2010). We presume that a judge acts without bias or prejudice. *Id.*

"The test for determining whether a judge should disqualify where the judge's impartiality might reasonably be questioned is an objective one." *Swenson*, 158 Wn. App. at 818. "A court must determine 'whether a reasonably prudent and disinterested observer would conclude [the defendant] obtained a fair, impartial, and neutral [hearing].'" *Id.* (quoting *State v. Dominguez*, 81 Wn. App. 325, 330, 914 P.2d 141 (1996)) (alterations in original). "However, '[w]ithout evidence of actual or potential bias, an appearance of fairness claim cannot succeed and is without merit.'" *Id.* (quoting *Post*, 118 Wn.2d at 619). "Further, a defendant who has reason to believe that a judge should be disqualified must act promptly to request recusal and 'cannot wait until he has received an adverse ruling and then move for disqualification.'" *Id.* (quoting *State v. Carlson*, 66 Wn. App. 909, 917, 833 P.2d 463 (1992)).

Here, Fenney argues that the trial court assumed "the role of the prosecutor in expanding the prosecutor's theories, admitting evidence to specifically demonstrate propensity for misconduct, allowing irrelevant evidence of purported gang membership, and denying a severance motion." Second Am. Br. of Appellant at 23. As shown above, none of Fenney's claims have merit. Thus, Fenney has not shown evidence of actual or potential bias on the part of the judge. *See Swenson*, 158 Wn. App. at 818. Because Fenney fails to show actual or potential bias, Fenney's claim that he did not receive a fair trial due to a partial judge fails.

G.      RACIAL BIAS

Fenney argues that the State's decision to charge him with human trafficking was based on race. To support his argument, Fenney points to seven human trafficking cases that were reviewed on appeal and contends that in every case, the defendant was a young black man. We disagree.

Prosecutors have broad discretion with respect to charging decisions. *State v. Lee*, 69 Wn. App. 31, 36, 847 P.2d 25, *review denied*, 122 Wn.2d 1003 (1993). "An individual charging decision will depend upon many factors, including the prosecutor's analysis of the strength of the evidence, the possible defenses and the public purpose to be served by the prosecution." *Id*. at 36-37; RCW 9.94A.411.

> The exercise of a prosecutor's discretion by charging some but not others guilty of the same crime does not violate the equal protection clause of the U.S. Const. amend. 14 or [the Washington] Const. art. 1, § 21 so long as the selection was not "deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification."

*State v. Judge*, 100 Wn.2d 706, 713, 675 P.2d 219 (1984) (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S. Ct. 501, 7 L .Ed. 2d. 446 (1962)). "A defendant's ultimate protection against overcharging lies in the requirement that the State prove all elements of the charged crime beyond a reasonable doubt." *Lee*, 69 Wn. App. at 37-38.

Fenney relies on *State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018), to demonstrate that our Supreme Court has embraced objective research to show racial bias. In *Gregory*, the court struck down Washington State's death penalty as unconstitutional under article I, section 14 because it was administered in an arbitrary and racially biased manner. *Id*. at 18-19. To reach this conclusion, the court afforded great weight to a study, which used statistical analysis, on the effect of race and county on the imposition of the death penalty. *Id.* at 12, 19. Upon the State's challenge to this report, the court ordered a rigorous evidentiary process, which resulted in an updated report that provided system-wide information concerning the death penalty. *Id.* at 13. The court stated that because of the State's challenge and the fact-finding process, the report became more refined, more accurate, and more reliable. *Id.* at 19.

Here, unlike in *Gregory*, Fenney has not provided any system-wide report on racism with regard to human trafficking charging decisions. Fenney merely states that there have been seven human trafficking cases reviewed on appeal, and in every case, the defendant was a young black man. This statement does not include the total number of human trafficking cases charged statewide, only those reviewed on appeal. Further, Fenney does not claim that the State failed to prove all elements of the human trafficking charge beyond a reasonable doubt. *See Lee*, 69 Wn. App. at 37-38. Thus, Fenney fails to show that State's decision to charge Fenney with human trafficking was based on race.

H.      CONCURRENT STATUTES

Fenney argues that the human trafficking statute and promoting prostitution in the first degree statute must be reversed and vacated because they are concurrent statutes. We disagree.

We review the question of whether two statutes are concurrent de novo. *State v. Chase*, 134 Wn. App. 792, 800, 142 P.3d 630 (2006), *review denied*, 160 Wn.2d 1022 (2007). "When a specific statute and a general statute punish the same conduct, the statutes are concurrent, and the State can only charge under the specific statute." *State v. Ou*, 156 Wn. App. 899, 902, 234 P.3d 1186 (2010), *review denied*, 170 Wn.2d 1017 (2011). "This rule gives effect to legislative intent and ensures charging decisions comport with that intent." *Id*.

If a person can violate the specific statute without violating the general statute, the statutes are not concurrent. *State v. Heffner*, 126 Wn. App. 803, 808, 110 P.3d 219 (2005). Statutes are concurrent only when every violation of the specific statute would result in a violation of the general statute. *Chase*, 134 Wn. App. at 800. "'The determinative factor is whether it is possible to commit the specific crime without also committing the general crime; *not* whether in a given

instance both crimes are committed by the defendant's particular conduct.'" *Ou*, 156 Wn. App. at 903 (quoting *State v. Crider*, 72 Wn. App. 815, 818, 866 P.2d 75 (1994)).

In determining whether two statutes are concurrent, we examine the elements of each of the statutes to ascertain whether a person can violate the specific statute without necessarily violating the general statute. *Heffner*, 126 Wn. App. at 808. Statutes are concurrent if all of the elements to convict under the general statute are also elements that must be proved for conviction under the specific statute. *Ou*, 156 Wn. App. at 903. Whether statutes are concurrent involves examination of the elements of the statutes, not the facts of the particular case. *Chase*, 134 Wn. App. at 802-03.

Under RCW 9A.40.100,

(1) A person is guilty of trafficking in the first degree when:

(a) Such person:
(i) Recruits, harbors, transports, provides, obtains, buys, purchases, or receives by any means another person knowing, or in reckless disregard of the fact, (A) that force, fraud, or coercion as defined in RCW 9A.36.070 will be used to cause the person to engage in:

. . . .

(IV) A commercial sex act

. . . .

and
(b) The acts or venture set forth in (a) of this subsection:
(i) Involve committing or attempting to commit kidnapping.

Under RCW 9A.88.070:

(1) A person is guilty of promoting prostitution in the first degree if he or she knowingly advances prostitution:

(a) By compelling a person by threat or force to engage in prostitution or profits from prostitution which results from such threat or force.

*State v. Clark*, 170 Wn. App. 166, 187, 283 P.3d 1116 (2012), *review denied*, 176 Wn.2d 1028 (2013), in which the court analyzed whether the appellant's right against double jeopardy was violated after he was convicted for both human trafficking in the second degree and promoting prostitution in the first degree, is instructive. The court held that the crime of human trafficking in the second degree required proof of a different mens rea than the crime of promoting prostitution in the first degree. *Id*. at 190-91. The court stated:

> Promoting prostitution in the first degree requires proof that the defendant actually used force to compel a person to engage in prostitution. Under former RCW 9A.88.070(1), a defendant "knowingly advances prostitution *by compelling* a person by threat or force to engage in prostitution." By contrast, the human trafficking statute requires the State to prove the defendant knew that force, fraud, or coercion "*will be used*" in the future to cause another person to engage in forced labor or involuntary servitude by engaging in prostitution. Former RCW 9A.40.100(2)(a)(i). The human trafficking statute requires proof that force, fraud, or coercion "*will be used* to cause the person to engage in forced labor or involuntary servitude." Former RCW 9A.40.100(2)(a)(i).

*Id*.

Here, like the court stated in *Clark*, the human trafficking offense and the promoting prostitution offense require proof of a different mens rea. *See id*. Promoting prostitution in the first degree requires proof that the defendant knowingly advances prostitution by using force or threats to compel a person to engage in prostitution. *See* RCW 9A.88.070(1)(a). By contrast, the human trafficking statute requires the State to prove the defendant knew that force, fraud, or coercion "*will be used*" to cause another to engage in a commercial sex act. *See* RCW 9A.40.100(1)(a) (emphasis added).

Further, the promoting prostitution offense does not require the commercial sex act to involve kidnapping, which the human trafficking offense requires. *See* RCW 9A.88.070; RCW 9A.40.100(1)(b)(i). Because a person can violate the promoting prostitution statute without necessarily violating the human trafficking statute, the statutes are not concurrent. *See Heffner*, 126 Wn. App. at 808. Therefore, Fenney's argument fails.

I.    SUFFICIENCY OF THE EVIDENCE TO SUPPORT CONVICTIONS

Fenney argues that there is insufficient evidence to support the convictions for felony harassment,[9] second degree assault,[10] and robbery.[11]

1.    Legal Principles

To determine if sufficient evidence supports a conviction, we consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). "The State bears the burden of proving all the elements of an offense beyond a reasonable doubt." *Id*. Where there is insufficient evidence to support a necessary element of the crime, we reverse and remand to vacate the conviction and dismiss the charge with prejudice. *See State v. Smith*, 155 Wn.2d 496, 498, 120 P.3d 559 (2005).

---

[9] Count 26.

[10] Count 16.

[11] Count 19.

2. Felony Harassment

Fenney argues, and the State concedes, that there was insufficient evidence to sustain the

conviction for felony harassment as charged in count 26. Fenney contends that B.C. did not testify

that Fenney threatened to kill her during the charged time period. We disagree.

RCW 9A.46.020 states:

(1) A person is guilty of harassment if:
    (a) Without lawful authority, the person knowingly threatens:
    (i) To cause bodily injury immediately or in the future to the person
threatened or to any other person:

    . . . .

    (iv) Maliciously to do any other act which is intended to substantially harm
the person threatened or another with respect to his or her physical or mental health
or safety; and
    (b) The person by words or conduct places the person threatened in
reasonable fear that the threat will be carried out. "Words or conduct" includes, in
addition to any other form of communication or conduct, the sending of an
electronic communication.

Generally, harassment is a gross misdemeanor. RCW 9A.46.020(2)(a). However, harassment is

a felony if the defendant makes threats to kill. RCW 9a.46.020(2)(b)(ii).

Here, the State had to prove that between October 5 and October 6, 2016, Fenney

threatened to kill B.C. and that Fenney placed B.C. in reasonable fear that the threat to kill would

be carried out. The evidence, viewed in the light most favorable to the State, shows that when

Fenney and B.C. returned to the Silver Street house from their scheduled meeting with Eric,

Fenney was carrying a firearm and told B.C. to go upstairs. Fenney picked up his machete and

repeatedly smacked B.C. with it. Fenney then forced B.C. to take her clothes off and began burning

her legs and vagina with a pen torch. While Fenney was burning B.C., he was saying, "You know

that I am going to kill you, b[****]." 4 VRP (Feb. 1, 2018) at 840. And B.C. believed that Fenney was going to kill her.

Based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that between October 5 and October 6, 2016, Fenney threatened to kill B.C. and that Fenney placed B.C. in reasonable fear that the threat to kill would be carried out. *See Rich*, 184 Wn.2d at 903. Therefore, the evidence was sufficient to support Fenney's conviction for felony harassment, and we reject the State's concession.

3.      Second Degree Assault

Fenney argues that the evidence was insufficient to sustain the conviction for second degree assault as charged in count 16 because B.C. did not testify that "the pain was intense or severe or caused her anguish such that a jury could reasonably consider it equivalent to torture." Second Am. Br. of Appellant at 58. We disagree.

RCW 9A.36.021 states:

(1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:

. . . .

(f) Knowingly inflicts bodily harm which by design causes such pain or agony as to be the equivalent of that produced by torture.

Here, the State had to prove that between September 1 and September 30, 2016, Fenney knowingly inflicted bodily harm on B.C. which caused such pain or agony as to be the equivalent of that produced by torture. The evidence, viewed in the light most favorable to the State, shows that in September 2016, Fenney began "beating [her] a[**]." 4 VRP (Feb. 1, 2018) at 787. Fenney

48

hit B.C. so hard that she fell. While B.C. was on the floor and crying, Fenney continued punching B.C. and then dumped two bottles of urine over her head.

Based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that between September 1 and 30, 2016, Fenney knowingly inflicted bodily harm on B.C. which caused such pain or agony as to be the equivalent of that produced by torture. Therefore, Fenney's sufficiency of the evidence claim lacks merit.[12]

4.      First Degree Robbery

Fenney argues, and the State concedes, that the evidence was insufficient to sustain the conviction for first degree robbery as charged in count 19. Fenney contends that B.C. handed the phone to Fenney, and Fenney did not take the phone against her will. Fenney further contends that he "did not threaten her with immediate or future injury or violence to obtain or keep the phone. Nor did he inflict injury on her [to] get or keep the phone." Second Am. Br. of Appellant at 60. We agree.

Under RCW 9A.56.190,

A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial.

---

[12] The State argues that Count 16 "pertained to the incident when Fenney whipped B.C. with the belt until she was unconscious." Am. Br. of Resp't at 59. But B.C. testified that Fenney whipped her with the belt and became unconscious in August. The State charged Fenney for this rape for the time period of August 20-21, 2016, in count 15. The dates alleged for count 16 were September 1 to 30, 2016. While B.C. testified that Fenney beat her in September, she did not testify that he beat her with a belt. Thus, the State seems to identify the wrong incident for count 16.

Under RCW 9A.56.200,

(1) A person is guilty of robbery in the first degree if:
      (a) In the commission of a robbery or of immediate flight therefrom, he or she:

    . . . .

      (iii) Inflicts bodily injury.

Here, the evidence, viewed in the light most favorable to the State, shows that in early October, Fenney demanded that B.C. give him her phone, and B.C. complied. B.C. was not nervous when she handed over the phone. Fenney had his firearm with him, as he always did, but B.C. did not remember exactly where it was.

Based on this evidence, a rational trier of fact could not find beyond a reasonable doubt that Fenney took B.C.'s phone by the use or threatened use of immediate force, violence, or fear of injury to B.C. or her property or the person or property of anyone. *See* RCW 9A.56.190. Fenney did not use force or fear to obtain or retain possession of the phone. *See* RCW 9A.56.190. Further, Fenney did not inflict bodily injury in the taking of the phone. *See* RCW 9A.56.200(1)(iii). Thus, there is insufficient evidence to support the conviction for first degree robbery. Because there is insufficient evidence to support the conviction, we accept the State's concession and reverse and remand to vacate the conviction for first degree robbery as charged in count 19 and dismiss the charge with prejudice. *See Smith*, 155 Wn.2d at 498.

J.     DOUBLE JEOPARDY/MERGER

Fenney argues that his constitutional right to be free from double jeopardy was violated. Fenney contends that because kidnapping was an element of the human trafficking in the first

degree charge, his three kidnapping charges should merge into the greater crime of human trafficking in the first degree. The State concedes. We agree.

The right to be free from double jeopardy protects a defendant from being punished multiple times for the same offense. *State v. Fuller*, 185 Wn.2d 30, 33-34, 367 P.3d 1057 (2016). We apply a three-step analysis to determine whether the legislature authorized multiple punishments for a single course of conduct. *State v. Thompson*, 192 Wn. App. 733, 737, 370 P.3d 586, *review denied*, 185 Wn.2d 1041 (2016). First, we consider the legislative intent based on the criminal statutes involved. *Id.* Second, if the statute is silent, we apply the "same evidence" test, which asks whether, as charged, each offense includes elements not included in the other and whether proof of one offense would also prove the other. *Id.* Third, if applicable, we may apply the merger doctrine to determine legislative intent "where the degree of one offense is elevated by conduct constituting a separate offense." *Id.* at 737-38. We review claims of double jeopardy de novo. *Fuller*, 185 Wn.2d at 34. Where a conviction violates double jeopardy, we reverse and remand to the trial court to vacate the conviction and for resentencing. *See In re Pers. Restraint of Francis*, 170 Wn.2d 517, 531, 242 P.3d 866 (2010).

Under RCW 9A.40.100,

(1) A person is guilty of trafficking in the first degree when:
    (a) Such person:
    (i) Recruits, harbors, transports, provides, obtains, buys, purchases, or receives by any means another person knowing, or in reckless disregard of the fact, (A) that force, fraud, or coercion as defined in RCW 9A.36.070 will be used to cause the person to engage in:

    . . . .

    (IV) A commercial sex act

. . . .

and
(b) The acts or venture set forth in (a) of this subsection:
(i) Involve committing or attempting to commit kidnapping.

. . . .

(3)(a) A person is guilty of trafficking in the second degree when such person:
(i) Recruits, harbors, transports, transfers, provides, obtains, buys, purchases, or receives by any means another person knowing, or in reckless disregard of the fact, that force, fraud, or coercion as defined in RCW 9A.36.70 will be used to cause the person to engage in forced labor, involuntary servitude, a sexually explicit act, or a commercial sex act, or that the person has not attained the age of eighteen years and is caused to engage in a sexually explicit act or a commercial sex act.

Under RCW 9A.40.020(1),

(1) A person is guilty of kidnapping in the first degree if he or she intentionally abducts another person with intent:

. . . .

(c) To inflict bodily injury on him or her; or
(d) To inflict extreme mental distress on him, her, or a third person.

1.    Legislative Intent

Our analysis begins with whether the legislature "authorized cumulative punishments for both crimes," either via "express or implicit legislative intent." *State v. Freeman*, 153 Wn.2d 765, 771-72, 108 P.3d 753 (2005). Here, neither the statute for human trafficking in the first degree nor the statute for kidnapping in the first degree explicitly authorizes these crimes to be punished separately from any related crime. *See* RCW 9A.40.100; RCW 9A.40.020(1). Furthermore, these statutes' legislative history do not reflect that the legislature intended to punish these offenses separately, making legislative intent unclear in this case.

2.      "Same Evidence" Test

We next analyze the convictions under the "same evidence" test: "'Where the *same act or transaction* constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision *requires proof of a fact* which the other does not.'" *Freeman*, 153 Wn.2d at 772 (internal quotation marks omitted) (quoting *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 817, 100 P.3d 291 (2004)).  Here, the first degree human trafficking charge required that Fenney commit or attempt to commit kidnapping of B.C.  *See* RCW 9A.40.100(1)(b)(i).  Thus, Fenney's separate convictions rely on some of the same evidence.

3.      Merger

When legislative intent is unclear, we also consider whether the merger doctrine is applicable.  *Freeman*, 153 Wn.2d at 772.  "Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime."  *Id.* at 772-73.

However, "even if on an abstract level two convictions appear to be for the same offense or for charges that would merge, if there is an independent purpose or effect to each, they may be punished as separate offenses."  *Id.* at 773.  "'To establish an independent purpose or effect of a particular crime, that crime must injure the person or property of the victim or others in a separate and distinct manner from the crime for which it also serves as an element.'"  *State v. Arndt*, 194 Wn.2d 784, 819, 453 P.3d 696 (2019) (quoting *State v. Harris*, 167 Wn. App. 340, 355, 272 P.3d 299 (2012)).  "This exception is less focused on abstract legislative intent and more focused on the facts of the individual case."  *Freeman*, 153 Wn.2d at 779.

Here, it is clear from the statute that the degree of human trafficking is raised from second degree to first degree when the trafficking involves committing or attempting to commit kidnapping. *See* RCW 9A.40.100. The State charged Fenney for first degree human trafficking for the time period of March 1, 2016 to November 22, 2016. And the State charged Fenney for three counts of first degree kidnapping for the following time periods: April 9, 2016, September 1-30, 2016, and October 5-6, 2016. Thus, all of the kidnapping charges are within the timeframe of the human trafficking charge.

While the above three incidents are three separate instances of kidnapping, there is no evidence that the incidents are separate and distinct from the human trafficking in the first degree charge. *See Arndt*, 194 Wn.2d at 819. Rather, the evidence shows that these kidnappings were all part of the single course of conduct that involved forcing and coercing B.C. into engaging in commercial sex acts.

Because the kidnappings were not separate and distinct from the first degree human trafficking charge, there was no independent purpose or effect of the kidnappings. *See id*. Thus, the charges merge. *See Freeman*, 153 Wn.2d at 773. Because the charges merge, we presume that the legislature intended to punish both offenses through the greater sentence for first degree human trafficking. *See id.* at 772-73. Accordingly, we accept the State's concession and remand to the trial court to vacate the three convictions for kidnapping and for resentencing. *See Francis*, 170 Wn.2d at 531.

We reverse Fenney's conviction for robbery and the three convictions for kidnapping, affirm the remainder of Fenney's convictions, and remand for the trial court to vacate Fenney's conviction for robbery and three convictions for kidnapping and for resentencing.

No. 52061-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____, C.J.
Lee, C.J.

We concur:

_____
Worswick, J.

_____
Veljacic, J.